McKEAGUE, Circuit Judge.
On August 25, 2016, Talon Air pilot Sean Fitzgerald showed up rip-roaring drunk to the Traverse City, Michigan, airport. Fitzgerald was set to fly that morning, so he went about readying a jet for take-off. He conducted a walk-around safety check before entering the cockpit, where he calibrated the altimeter, programmed the flight-management system, turned on the auxiliary power unit, and requested flight clearance from air-traffic control.
Thankfully for the passengers yet to board, Fitzgerald's co-pilot recognized his inebriation and alerted Talon Air executives, who in turn notified local law enforcement. Fitzgerald was arrested and charged under 18 U.S.C. § 342, which makes it a crime to operate a common carrier while intoxicated. The jury convicted Fitzgerald, and the district court sentenced him to one year and one day in prison and to three years of supervised release. On appeal, Fitzgerald contends that the actions he performed were not enough to operate the aircraft within the meaning of § 342, that the jury was wrongly instructed, and that the district court erred at his sentencing. We AFFIRM .
*441 I
On August 25, 2016, Sean Fitzgerald and Manuel Ramirez were scheduled to fly a private jet for Talon Air from Traverse City, Michigan to Bedford, Massachusetts. The two planned to meet in the lobby of their hotel roughly two hours before their 8:20 a.m. scheduled departure. Fitzgerald showed up late, and Ramirez said he immediately "felt" alcohol on Fitzgerald-his breath smelled of it, and his eyes were bloodshot. Ramirez three times pressed Fitzgerald during their drive to the airport whether he was fit to fly. Fitzgerald three times denied that anything was amiss.
Ramirez and Fitzgerald arrived at the airport around 7:00 a.m. Ramirez questioned Fitzgerald a fourth time, but Fitzgerald again insisted he was fine. Unconvinced, Ramirez took matters into his own hands. He asked Fitzgerald to stay put, then called his superiors at Talon Air, who in turn notified the Traverse City Police Department.
Meanwhile, Fitzgerald began to prepare the airplane for flight. Fitzgerald ordered fuel; completed a "walkaround" inspection of the outside of the airplane; and entered the cockpit, where he calibrated the altimeter, programmed the flight-management system, turned on the auxiliary power unit, and requested flight clearance from air-traffic control.[1]
The police soon after arrived and found Fitzgerald in the cockpit, still tinkering with the airplane's controls. The police ran Fitzgerald through a visual sobriety test, which Fitzgerald promptly failed. Two subsequent breath tests confirmed what his bloodshot eyes suggested: Fitzgerald was very drunk, registering a blood-alcohol content (BAC) of 0.301% and 0.312%.[2] Fitzgerald was arrested and taken to a nearby hospital for further examination; a blood test 90 minutes later revealed a 0.343% BAC. For reference, a BAC of .10% gives rise to a presumption of intoxication under the statute. 18 U.S.C. § 343. FAA regulations, meanwhile, prohibit acting or attempting to act as a crewmember of a civil aircraft with a BAC of 0.04% or higher-meaning that Fitzgerald's BAC was about eight times over that limit. 14 C.F.R. § 91.17(a)(4).
The government charged Fitzgerald with operating a common carrier while under the influence of alcohol in violation of 18 U.S.C. § 342. Fitzgerald moved to dismiss the indictment on the basis that his preflight actions did not constitute operating the aircraft, but the district court denied the motion. The parties nevertheless continued to wrangle in the lead-up to trial about what it means to "operate" an airplane. In general, Fitzgerald argued for a more restrictive definition, contending that only actions taken once passengers were aboard or the engines were turned on could constitute operation. The government urged a more flexible definition without such bright-line cutoffs. After extensive briefing and a few iterations, the district court landed on the instruction at the heart of this case.
At trial, Fitzgerald admitted that he was intoxicated and that the airplane was a common carrier. The lone issue, therefore, was whether Fitzgerald "operated" the airplane. After proofs closed, Fitzgerald moved for a judgment of acquittal, which the district court denied. The jury convicted Fitzgerald, and the district court-after *442 rejecting Fitzgerald's request for a downward departure-sentenced him to one year and one day in prison and to three years of supervised release. Fitzgerald now challenges the district court's interpretation of "operate," the sufficiency of the evidence supporting his conviction, the jury instructions, and his sentence.
II
The core question in this case is one that neither we nor any of our sister circuits have confronted: what does it mean to "operate" a common carrier under 18 U.S.C. § 342 ? Fitzgerald contends that the district court's erroneous definition of the term led it to mistakenly deny his motion for a judgment of acquittal and, eventually, caused the jury to wrongfully convict him. Section 342 provides:
Whoever operates or directs the operation of a common carrier while under the influence of alcohol or any controlled substance (as defined in section 102 of the Controlled Substances Act ( 21 U.S.C. 802 ) ), shall be imprisoned not more than fifteen years or fined under this title, or both.
The government thus had to prove three elements beyond a reasonable doubt: that Fitzgerald (1) operated or directed the operation of (2) a common carrier (3) while intoxicated. Because Fitzgerald concedes the aircraft he was preparing to fly was a common carrier and that he was intoxicated, the only question is the first element-whether his actions sufficed to "operate" the airplane. The district court instructed the jury as follows on the meaning of operate:
The term "operate" generally means to run or control the functioning of something. For a commercial pilot this term includes anything the pilot does or directs in his capacity as a pilot before, during, or after flight, but only if the evidence convinces you beyond a reasonable doubt that the activity or direction was directly and proximately linked to actual operational or functional requirements for the flight and not simply some administrative or clerical task.
Fitzgerald says the instruction swept too broadly. He argues that to operate an airplane is to control its movement , and that because the airplane never moved-the engines in fact never started-he did not operate the aircraft. The government objects that Fitzgerald's definition is unduly cramped and that the statute covers "the operation of the plane in preparation for it to move." Appellee Br. at 23 (emphasis added).[3] The district court's instruction, the government contends, rightly accounted for this.
We review this question of statutory interpretation de novo, United States v. Miller , 734 F.3d 530, 539 (6th Cir. 2013), though a well-trod path guides our inquiry. We start with the disputed term itself, which, if left undefined in the statute, must be given "its ordinary or natural meaning." Id. at 540 (quoting Smith v. United States , 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) ). If a word in isolation is susceptible of multiple meanings, however, we work outward and examine the statutory context, "consider[ing] not only the bare meaning of the word but also its placement and purpose in the statutory scheme." Id. (quoting Bailey v. United States , 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) ). Last of all, working only within the range of "textually permissible meanings," we consider which *443 of those interpretations would serve, rather than frustrate, the statute's manifest purpose. Antonin Scalia & Bryan A. Garner, Reading Law 57 (2012); see John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank , 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (interpreting "language of the governing statute" in light of the statute's "object and policy").
The Ordinary Meaning of "Operates ." The statute does not define the term "operate," so we can assume that Congress intended the word be given its ordinary meaning. Miller , 734 F.3d at 540. Dictionaries provide a helpful proxy. One defines "operate" as: "To cause or actuate the working of; to work (a machine, etc.)." Oxford English Dictionary 848 (2d ed. 1989). Another: "To work or use a machine, apparatus, or the like." Random House Dictionary of the English Language 1357 (2d ed. 1987). And another: "to cause to function usu[ally] by direct personal effort: work (a car) (operating a drill press)." Webster's Third New International Dictionary of the English Language 1581 (3d ed. 1986). Finally, there is the definition the district court incorporated directly into the jury instructions: "To run or control the functioning of." American Heritage Dictionary 1233 (4th ed. 2000).
Under each of the above definitions, Fitzgerald could be deemed to have "operated" the aircraft when he took certain preflight steps. Recall what Fitzgerald did: he calibrated the altimeter (which calculates altitude), programmed the flight-management system (which controls navigation), turned on the auxiliary power unit (which provides energy for functions other than propulsion), and requested flight clearance from air-traffic control. Fitzgerald's actions by themselves were not sufficient to "cause" the airplane to take flight (as the Oxford and Webster's Dictionaries would say), but they were necessary steps along the way. And Fitzgerald was certainly "work[ing] or us[ing] a machine" under the Random House definition-he adjusted its instruments and programmed its flight path. On the same reasoning, Fitzgerald appears to have "run or control[led] the functioning of" the airplane under the American Heritage definition. The upshot of our dive into the dictionaries, then, is that "operate" comprises a wide universe of actions-anything that causes a machine to work, works a machine, or controls a machine's functioning. For the sake of clarity moving forward, we use the American Heritage definition that the district court used (a definition, by the way, to which both parties acceded below): to "operate" something is to run or control its functioning.
Still, questions of kind and degree remain. Ordinary usage may teach us that to operate something is to run or control it, but what kind of control must one exert over an airplane? Surely not every act of control can count-that would sweep in every mechanic who swaps out a part before take-off and any flight attendant who seals the airplane doors. And how much control must a pilot exercise? Commercial aircraft are almost always guided by two pilots; if one performs only 10% of those tasks necessary to operate the plane, has he operated it? Though we can safely say that a pilot "operates" a plane even while auto-pilot is engaged, what of the pilot who calibrates the plane's instruments while still on the ground? The word "operates" by itself does not suggest obvious limiting principles that help answer these questions. So, to context we turn. Miller , 734 F.3d at 540.
Statutory Context . However ambiguous "operates" may be in isolation, "context gives meaning." United States v. Santos , 553 U.S. 507, 512, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (stating that a statutory *444 term must be read "as it is used in the federal ... statute"). Indeed, even were we convinced that "operates" had a clear definition in isolation, "[t]he meaning of statutory language, plain or not, depends on context." Miller , 734 F.3d at 540.
Fitzgerald contends that the statutory context strengthens his interpretation. Because § 342 is devoted to common carriers-planes, trains, buses, and ships-Fitzgerald argues "operates" must "be viewed as control relative to movement." That is, it's not enough to define operates as to "run or control the functioning of" the machine; instead, the person must "run or control the functioning of" the machine's "essential function." And since a common carrier's essential function is to move passengers from point A to point B, Fitzgerald says the ordinary meaning of operating a common carrier is to run or control "the movement necessary for travel and transportation." Fitzgerald hopes some analogies will illustrate his point. He argues that one does not "operate" a computer simply by opening the hardware and making a repair, even if one would say that action "controls the computer's functioning." Instead, a person operates a computer only when she uses it for its "central function, i.e. , use for personal computing." Likewise, Fitzgerald says one does not "operate" a bicycle by giving it a tune-up; that occurs only when a person "control[s] its essential function, i.e. , by riding it."
Fitzgerald has a point, but he takes it too far. Section 342 is indeed a law about common carriers, all of which have the goal of moving paying passengers from one place to another. It does make sense, then, to interpret "operates" by reference to movement. But why should the contextual North Star be "common carrier," as opposed to the specific type of common carrier at issue in a given case? A far more natural and sensible approach is to consider what it means to operate a bus, or a train, or a ship-or, in this case, an airplane-rather than to treat common carriers as a monolithic entity. A look to § 342 's neighbor shows that Congress has done just that. See 18 U.S.C. § 341 (distinguishing various types of common carriers). And the safe and effective movement of an airplane is not determined by actions taken only after passengers board or the engines start or the airplane moves, which appear to be Fitzgerald's favored lines for demarcating when "operating" can begin. To the contrary, actions taken before any of these arbitrary boxes are checked might influence the aircraft's movement just as much as those taken after-a truth well borne out by the evidence in this case.[4] So, Fitzgerald is right that "operates" should be interpreted in a way that accounts for common carriers' essential movement function, but the government is right that "operates" should be read in light of the common-sense understanding that the safe and effective movement of a complex airplane depends on actions taken long before actual movement ever begins.[5]
*445 Where does that leave us in our interpretive puzzle? Somewhere, we think, right around the jury instructions given by the district court. The instructions reflected the idea that to "operate" a common carrier is to control its movement by emphasizing that Fitzgerald's actions could only count as operating if they were connected to "the flight" of the airplane. Yet the district court also understood that a definition limited only to activities during the flight itself would not work, because that would fail to account for the critical preflight activities pilots must complete to actually (and safely) move an aircraft. So the district court interpreted "operates" to include pilot actions "directly and proximately linked to actual operational or functional requirements for the flight."
These instructions fit nicely in the context of operating a complex airplane, including the reality that preflight actions might well dictate the airplane's movement once the engines are fired up and the plane is in the air. As the district court explained in its pretrial ruling on the instructions issue:
[O]nce a commercial pilot steps on board the aircraft and into the cockpit, it is hard to characterize any activity undertaken as merely administrative. The pilot is now in the physical location where he or she can access all of the aircraft controls. The required pre-flight checks involve physically testing and checking the controls that will be used in flight-radio, rudder pedals, circuit breakers, autopilot and fuel gauges to name a few. Some of what the pilot does may actually directly control the function of the aircraft , such as inputting flight-plan parameters that will engage when the autopilot feature takes over in flight. The Court's proposed language takes these situations into account[.]
R. 38, PID 107 (emphasis added). And indeed, the evidence at trial showed Fitzgerald completed at least one of those preflight actions that directly control the airplane's in-flight movement. Fitzgerald's co-pilot, Ramirez, testified that he saw Fitzgerald "inputting information" into the aircraft's "flight management system," which Ramirez said "is basically the navigation brain of the aircraft. Anything you input in there the aircraft will follow."
This testimony alone points up the unworkability of Fitzgerald's engines-on, passengers-aboard, actually-moving approach; none of these conditions were met, and yet Fitzgerald was controlling the airplane's "navigation brain." It also undercuts the dissent's similar requirements. Even accepting the dissent's premise that to operate an "air common carrier" is to "control its transport of public passengers or freight," it is apparent from Ramirez's "navigation brain" testimony alone that passengers need not be on board nor the plane actually moving for a pilot to exercise control over the flight. And, lastly, the evidence at trial puts the lie to Fitzgerald's computer and bicycle analogies. The repair work described in the examples is far different from the preparatory steps Fitzgerald took in the cockpit. In the analogies, nothing done dictates how a person will use the computer-what applications will be accessed, or to what end the computer's processing power will be put-or how a person will move the bicycle-going a certain speed, or traveling in a particular direction. In Fitzgerald's case, by contrast, the actions he took-including programming the airplane's "navigation brain"-may *446 well have controlled the airplane's movement once in flight.
The district court's explanation for its instructions also bolsters the point that what it means to "operate" a common carrier will vary quite a lot among the vehicles that comprise the class of common carriers. The act of operating an airplane is far more complex than driving a bus, and certain pre-movement activities might be especially critical for the former. A pilot's intoxication while preparing for take-off-especially when he is completing tasks without a co-pilot's supervision, as Fitzgerald's co-pilot said was their custom-might prove more dangerous than a pilot's intoxication during flight itself, for at least two reasons. The first is that commercial air travel, unlike road travel, is almost always done by at least two pilots. Had Fitzgerald actually taken flight on the Talon Air jet that morning, Ramirez could have taken the reins. The second is that air travel, again unlike road travel, is not so reliant on the split-second, start-stop reflexes that are often called upon while driving in traffic. A plane should never find itself passing another plane head-on in close proximity or forced to hit the brakes because of a sudden slow-down. This is not to say a pilot's job is an easy one, but only that intoxication in the lead-up to take-off may well dictate the plane's safe and effective movement more than anything that happens up in the air.
Contextual considerations-with due attention paid to the intricacies of operating an aircraft specifically and not just a "common carrier" generally-thus establish the integrity of the district court's interpretation of "operate." And even assuming the term remained ambiguous, the statute's public-safety purpose further confirms the district court's reading.
Statutory Purpose . Where Congress's objective is clear, we consider whether that "purpose is better served by construing" a statute one way or the other. See Holloway v. United States , 526 U.S. 1, 9, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) ; see also Scalia & Garner, Reading Law 56 ("[T]he resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose."). The parties disagree about how to best define § 342 's purpose. Fitzgerald frames it in a more limited fashion. He says the purpose of § 342 is to protect passengers from harm during movement. The government offers a broader purpose. It says the statute is meant to protect people from harm while a common carrier is moving, like Fitzgerald says, but also while it is being prepared to move. This disagreement creates the misimpression that neither party's interpretation of "operates" works under both conceptions of § 342 's purpose. This just isn't so.
Even accepting that Fitzgerald is right about the purpose of § 342-that it is only meant to protect passengers during movement-it does not follow that actions taken in preparation for movement should fall outside § 342 's reach. That rule would frustrate, not effectuate, § 342 's purpose. Suppose this case presented far more tragic facts: that after Fitzgerald was removed from the flight, Ramirez neglected to re-program the flight-management system, and that shortly after take-off, the path charted by Fitzgerald's handiwork caused the Talon Air jet to collide with another plane. In this scenario, the calamity occurred while the plane was moving, but the root cause of it was Fitzgerald's error during preparation. Yet on Fitzgerald's view of § 342, he would evade prosecution. No matter how integral the steps he took were to the plane's actual movement, if those steps were done before movement commenced, Fitzgerald says § 342 ought *447 not bear on his behavior. That construction of the statute would frustrate Fitzgerald's own conception of § 342 's purpose to protect passengers on common carriers during movement.
It may go too far to say § 342 would be rendered an absurdity if it did not cover preflight conduct, since the statute would, after all, still reach certifiably drunk pilots in midair. Even so, "absurd results are to be avoided," United States v. Turkette , 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and courts should not construe a statute to "produce an absurd result that we are confident Congress did not intend," United States v. Underhill , 813 F.2d 105, 112 (6th Cir. 1987). But if we drew the "operates" line at engine-firing or wheels-turning, peculiar results could follow. One is highlighted vividly (if sensationally) by the government: "the drunk pilot would have to be traveling down the runway, with human lives strapped into a twenty-ton hunk of metal and fuel, hurtling toward 35,000 feet at 500 miles per hour, before federal law would prohibit his conduct." The example illustrates how anomalous it would be to treat an airplane and a bus the same for operating-while-intoxicated purposes. Airplanes cannot be pulled over. And a pilot who realizes he's had one too many drinks cannot slide into a rest stop and sleep it off. Once the flight has begun, all those mitigating options have vanished. The passengers and the public are at the pilot's mercy-dulled senses, impaired judgment, and all. If a pilot cannot violate § 342 by his preflight conduct, or can do so only when it may be too late to stop him, Congress's desire to protect passengers on common carriers would be undermined. While the statute would not be rendered toothless, it would lose its most meaningful bite.[6]
Some 200 years ago, the Supreme Court refused a similar invitation to defang federal law. In The Emily & the Caroline , the Court considered a provision in The Slave Trade Act of 1794 that made it illegal to "prepare [ ] any ship or vessel ... for the purpose of carrying on any trade or traffic in slaves"; any ship so prepared was subject to forfeiture. 22 U.S. (9 Wheat.) 381, 6 L.Ed. 116 (1824). The critical question was whether "prepare" meant to begin preparation or to complete it. The shipowners argued the latter and insisted their actions were a "mere inceptive fitting out, or an attempt to fit out" and thus "did not constitute the offence created by the acts of Congress." Id. at 383. The Court would have none of it. Because such an interpretation would make enforcement nearly impossible-the ship could simply set sail, thereby evading capture-the Court settled on a more flexible standard:
As soon ... as the preparations have progressed, so far as clearly and satisfactorily to show the purpose for which they are made, the right of seizure attaches. To apply the construction contended for on the part of the claimant, that the fitting or preparation must be complete, and the vessel ready for sea, before she can be seized, would be rendering the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner.
Id. at 389. As with the Emily and Caroline ships, so too with airplanes. If "operate" started with movement, "evasion of the law"-at least until the danger it sought to prevent had already materialized-would be "rendered almost certain." See *448 id. at 390. Accordingly, not only is the district court's interpretation tenable as a textual matter, it is also superior to Fitzgerald's as a practical one: it would further § 342 's public-safety purpose, not frustrate it.
Lastly, a few words on the rule of lenity, to which, had we discovered ambiguity in the term "operate," we could turn to break an interpretive-grid lock in Fitzgerald's favor. See United States v. Bass , 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). Fitzgerald summons the rule here, but it is inapt for two reasons. First, we only invoke the rule when the usual tools of statutory construction leave us with a "grievous ambiguity," not when, as here, they resolve the interpretive question. Chapman v. United States , 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citation omitted). But even if such ambiguity remained, the rule is a poor fit for this case. Lenity is premised in large measure on fair-notice principles-the idea that citizens must be given fair warning that certain conduct might subject them to criminal sanction. See McBoyle v. United States , 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931) (refusing to expand a criminal statute's reach without "a fair warning ... given to the world in language the common world will understand"); United States v. Lanier , 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (describing lenity "as a sort of junior version of the vagueness doctrine" that "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered" (citation and quotation marks omitted) ). This court has embraced the same understanding of lenity. See United States v. Canelas-Amador , 837 F.3d 668, 674 (6th Cir. 2016) (invoking lenity where law did not provide a "minimum level of clarity and transparency" and thus "fail[ed] to provide fair notice"). Fitzgerald, however, did not lack fair notice that he was acting illegally. Every American from their teenage years onward understands the delinquency inherent in drunk driving. Perhaps no one appreciates this reality more than a commercial airplane pilot with passengers in his care. It is thus little wonder why Fitzgerald repeatedly denied having had anything to drink; he knew answering otherwise would keep him from the cockpit. Nor is it surprising that Fitzgerald begged his arresting officer's mercy and told him that "this is going to ruin my life." In short, even if the appropriate meaning of "operate" remained ambiguous, we would hesitate to invoke the rule of lenity to resolve it.
* * *
While this case presents an interesting question of statutory interpretation, it is only because, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." Grayned v. City of Rockford , 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (addressing vagueness argument). No definition of "operate" could account seamlessly for the facts presented by cases, like this one, at the margin. What is clear, however, is that the rules proposed by Fitzgerald and the dissent-that passengers must be aboard, the engines must be on, and the plane must be moving-are neither textually mandated nor practically sensible. The district court's interpretation of "operate," by contrast, was suitably tailored to the particular facts of this case and provided the jury with ample and accurate guidance for its deliberations. We therefore reject Fitzgerald's interpretive challenge.
III
Given the district court's interpretation of "operate," did the government produce enough evidence to sustain the jury's verdict against Fitzgerald? Clearly, yes.
*449 This court "will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." United States v. Taylor , 800 F.3d 701, 711 (6th Cir. 2015). In determining whether "substantial and competent evidence" supported the judgment, this court must draw all reasonable inferences from the record in favor of the prosecution and must avoid the temptation to weigh the evidence anew or assess the credibility of witnesses. Id. After doing so, if "any rational [juror] could have found the essential elements of the crime beyond a reasonable doubt," the judgment must be affirmed. Id.
The analysis above respecting the meaning of "operate" largely resolves Fitzgerald's sufficiency challenge. The evidence presented at trial, taken in the light most favorable to the prosecution, showed that Fitzgerald manipulated several of the airplane's controls for nearly an hour, turning on the auxiliary power unit, calibrating the altitude-measuring device, programming the flight-management system, and communicating with air-traffic control. Any one of these actions alone might have provided sufficient evidence of operation. Taken together, it is not close: a rational trier of fact could have found beyond a reasonable doubt that Fitzgerald operated the aircraft, since he performed many "actual operational or functional requirements for the flight, and not simply some administrative or clerical task." Sufficient evidence therefore supported Fitzgerald's conviction.
IV
Fitzgerald next argues that the district court's definition of "operate" led it to commit a second reversible error: providing erroneous jury instructions. We review a district court's instructions, including any responses to jury questions, for an abuse of discretion. United States v. Fisher , 648 F.3d 442, 446-47 (6th Cir. 2011). This means we will not quibble with the court's instructions unless they were, as a whole, "confusing, misleading, and prejudicial." United States v. Young , 553 F.3d 1035, 1050 (6th Cir. 2009) (citation and quotation marks omitted).
As with Fitzgerald's sufficiency-of-the-evidence challenge, the fact that we have ruled against him on the meaning of "operate" all but dooms his cause on the instructions issue. Fitzgerald's primary argument is the same one we have already rejected-that the "directly and proximately linked to actual operational or functional requirements for the flight" goes beyond the proper meaning of "operate" because it "goes well beyond control of movement."
But one wrinkle in Fitzgerald's jury-instructions argument warrants further discussion. Fitzgerald says the court's instruction and its answer to a later jury question on the instruction-in light of the testimony at trial-in effect directed a verdict against him. His argument runs likes this: the government's aviation expert testified that any step listed in the airplane's instruction manual was an operational or functional requirement for flight; evidence at trial showed Fitzgerald completed some of the steps in the instruction manual; and since the district court's instruction said that completing any operational or functional requirement for the flight constituted operation of the aircraft, the jury had no choice but to convict. As Fitzgerald puts it, "a reasonable juror would have understood the court's instruction to define 'operates' as akin to 'undertakes any step listed in the aircraft's instruction manual.' "
We disagree. Neither the district court's instruction, nor its later response to the *450 jury's question, told the jury what counts as an operational or functional requirement for the flight. True, the government's witness testified that he would consider certain items in the manual's preflight checklist to constitute operational or functional requirements, but never-not in the instructions themselves, and not in any answer to jury questions-did the district court instruct the jury that it must accept that testimony. The jury asked the court to clarify whether "actual operational or functional requirements for the flight" meant "flight of [the] plane physically or does it mean 'legally' as per operation manual?" The court responded that the "operation manual ... may have some help for you on what you think fits within those requirements," but cautioned the jury that the manual will not "give you the magic answer" and that this was not "a needle-in-a-haystack operation."[7] Rather, as with any piece of evidence, the district court said the manual is but one part of an "amalgamation"; it remained the jury's job to decide how to treat the manual and the government witness's testimony, and how to weigh all the evidence together in deciding whether Fitzgerald's actions qualified as operational or functional requirements for the flight.
Far from directing a verdict against Fitzgerald, the district court's instruction and its answer to the jury's question fairly captured what it means to operate an airplane, and allowed the jury to decide whether the evidence showed Fitzgerald had done so. This was no abuse of discretion.
V
Fitzgerald's last challenge is to his sentence. Fitzgerald moved for a downward departure under United States Sentencing Guidelines § 2D2.3, the commentary to which provides: "If no or only a few passengers were placed at risk, a downward departure may be warranted." The district court declined. Ordinarily, we do not review a district court's denial of a downward departure, United States v. Gale , 468 F.3d 929, 937 (6th Cir. 2006), but that changes when "the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." United States v. Theunick , 651 F.3d 578, 592 (6th Cir. 2011) (citation and quotation marks omitted). In such a situation, this court may order a remand for the district court to consider, with a proper view of its own authority, whether a downward departure is warranted. Fitzgerald says that situation obtains here.
He is wrong. The district court expressly recognized the authority vested in it by virtue of the commentary following § 2D2.3. Referring to the application note, the district court said: "It's a guidance. It's a permissive statement. And it's one that I don't think on the facts of this case actually warrant or trigger a departure." The district court correctly conceptualized § 2D2.3 as imbuing it with discretion, not mandating any particular departure-an understanding consistent with the commentary's language, which says only that a "downward departure may be warranted." § 2D2.3 (emphasis added). So the district court quite clearly understood it could depart downward. It just chose not to do so.
All the same, Fitzgerald says there is another problem: maybe the district court understood it had discretion generally to depart downward, but it misunderstood *451 the considerations that should inform the exercise of that discretion. Specifically, Fitzgerald argues that the district court declined to depart by focusing on the harm Fitzgerald's actions posed to any person, rather than specifically on passengers, with which § 2D2.3 is concerned. To convince us, Fitzgerald cherry-picks quotations from the sentencing hearing where the district court discussed the "real physical risk to people on the ground because of Mr. Fitzgerald's condition," rather than the number of passengers Fitzgerald had imperiled. Yet as the government notes, the district court also explained its refusal to depart downward by stating this was not a case where "no or only a few passengers were placed at risk." § 2D2.3. Instead, the district court noted that this was a "regularly scheduled commercial flight" with "passengers that were scheduled to depart, should have departed, and but for the intervention of the captain and ground crew and other people at the airport would have departed with a drunk pilot." True, the flight was a smaller charter flight-three passengers would be on board-but it is for the district court, not us, to decide what counts as a sufficiently minor risk to warrant a downward departure. Fitzgerald's sentencing challenge therefore fails.
VI
The judgment of the district court is AFFIRMED .
DISSENT

Given the scope of this court's review of jury verdicts, the fact summary is presented in the light most favorable to the prosecution.

"BAC" sometimes also refers to "blood alcohol concentration," but we use "content" since it is consistent with the United States Code. See 18 U.S.C. § 343.

Interestingly, neither "movement" nor "preparation"-words stressed by the parties-appears in the statute.

It is noteworthy that the dissent's proposed approach would create a more restrictive cut-off for operation than even Fitzgerald proposes, since the latter, after all, admits that activities "proximate" to movement might suffice to operate a common carrier. The dissent ties its definition of "operate" to its definition of "common carrier," arguing that an airplane does not become a common carrier until the instant it is transporting passengers or freight, so a pilot cannot operate a common carrier before that instant.

This is an obvious point, and evidence at trial adequately established it, but the FAA's Airplane Flying Handbook makes it explicitly in its chapter on "Ground Operations": "All pilots must ensure that they place a strong emphasis on ground operations as this is where safe flight begins and ends . At no time should a pilot hastily consider ground operations without proper and effective thoroughness." The Handbook is available at https://www.faa.gov/regulations_policies/handbooks_manuals/aviation/airplane_handbook/media/04_afh_ch2.pdf

To be sure, the statute could still be enforced against pilots, but seemingly only once a pilot has completed a flight-and hence only after the danger the statute guards against has come to pass. See United States v. Cope , 676 F.3d 1219 (10th Cir. 2012) (prosecuting pilot under § 342, but only after he had completed a flight).

Though Fitzgerald's argument about the court's answer to the jury's question fails on its own merits, it may also have been waived; Fitzgerald's attorney "basically, d[id not] object" to the court's answer to the jury's question.