RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KELLI PRATHER,

*Defendant-Appellant*.

No. 24-3300

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:21-cr-00038-1—Matthew W. McFarland, District Judge.

Decided and Filed: May 27, 2025

Before: THAPAR, BUSH, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Kaycee L. Berente, Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge. A jury convicted Kelli Prather of bank fraud, wire fraud, aggravated identity theft, and making a false statement on a loan application. The district court sentenced her to 84 months' imprisonment. Prather appeals her conviction and sentence. For the following reasons, we AFFIRM.

I.

In late March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The CARES Act provided emergency economic assistance to millions of Americans to mitigate harm from the COVID-19 pandemic. As part of the CARES Act, the Small Business Administration (SBA) created the Paycheck Protection Program (PPP) to provide monetary funds to small businesses. The SBA guaranteed the loans, while private financial institutions underwrote and issued them to businesses. The loans were to cover business expenses, and if the loan recipient spent the funds appropriately, the loans could be fully forgiven. The CARES Act also expanded the Economic Injury Disaster Loan (EIDL) Program. Like the PPP, the expansion of the EIDL Program offered financial assistance to businesses during the pandemic. Also, like the PPP loans, EIDL loans were for business expenses. Unlike the PPP loans, however, EIDL loans were funded by the federal government, not private institutions, and had to be repaid.

Faced with businesses' pressing needs and piles of applications, financial institutions and the federal government streamlined the loan-application process to disburse funds faster. The speed at which the institutions provided economic relief exposed the programs to large amounts of fraud. Kelli Prather was one of many individuals who abused the system.

From June through August 2020, Prather submitted six PPP-loan applications with Fifth Third Bank for six different businesses. Her first application was successful, and she received a loan of nearly $20,000. Bank records reflect that she used the money for personal expenses.

As Prather's PPP applications rolled in, the Fifth Third Bank employee processing her applications noticed irregularities. For instance, one purported business had four different business structures for taxation purposes within the same business year—something the bank employee had never seen. Another loan application stated that the value of the business's inventory far surpassed that of its assets, even though inventory is a type of asset. Meanwhile, other applications showed that Prather's businesses spent more money on wages than they earned in income.

The abnormalities prompted Fifth Third Bank to decline Prather's remaining PPP-loan applications and refer the matter to federal law enforcement in late summer 2020. Investigations revealed that, of the six businesses for which Prather submitted applications, all but one were nonoperational. The one functioning business earned a total income of $1,500 in 2019. Prather nevertheless sought north of $600,000 in PPP loans. Based on these findings, a grand jury indicted Prather in April 2021 on six counts of bank fraud and one count of making a false statement on a loan application.

Following the initial indictment, federal agents learned that Prather had also sought EIDL loans, and they investigated the matter. As with the PPP-loan applications, inconsistencies abounded among Prather's EIDL-loan applications. For example, in summer 2020 Prather submitted EIDL applications for three businesses. Each application stated that Prather had either a 99 or 100% ownership interest in the business and that the business had a gross revenue of no more than $12,000. Come November, EIDL received loan applications for the same three businesses, but this time in the name of Prather's nephew, D.P. The November applications stated gross revenues for each business well north of $300,000 and listed D.P. as having a 55% ownership stake. The same day those applications were submitted, Prather filed an EIDL-loan application in her own name for a fourth business. Though Prather had complete ownership of the purported business, its stated gross revenues, like the others, were over $300,000.

When investigators visited the businesses' listed addresses, they found mainly residential homes. Investigators also learned that D.P. suffered from a mental disability entitling him to Title II disability benefits and Social Security Income (SSI) payments; if the information in the EIDL applications were true, it would affect D.P.'s eligibility for these payments. When investigators interviewed D.P., he appeared unfamiliar with how businesses are run or what the EIDL application process entails. These findings led investigators to believe that D.P. was likely a victim of identity theft, not Prather's co-conspirator.

In February 2023, a grand jury issued a superseding indictment, charging Prather with fourteen counts. Counts 1 through 6 charged her with bank fraud, in violation of 18 U.S.C. § 1344. Count 7 charged her with making a false statement on a loan application, in violation of 18 U.S.C. § 1014. Counts 8 through 11 charged her with wire fraud, in violation of 18 U.S.C.

§§ 1343 and 2.  And counts 12 through 14 charged her with aggravated identity theft, in violation of 18 U.S.C. § 1028A.

A jury convicted Prather on all counts.  The district court sentenced her to 60 months' imprisonment for each of the first eleven counts, with the terms to run concurrently.  The court sentenced her to 24 months' imprisonment for each of the final three counts, with the terms to run concurrently with each other and consecutively to counts 1 through 11.  Prather appeals.

II.

A.

We first consider Prather's argument that the government offered insufficient evidence to support her aggravated identity theft convictions.  The aggravated identity theft statute provides that "[w]hoever, during and in relation to" certain felony offenses, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C § 1028A(a)(1).  Prather argues that the government's case lacked evidence that she used her nephew D.P.'s means of identification "without lawful authority." Appellant Br. at 27.

Prather concedes that she failed to preserve her sufficiency-of-the-evidence challenge below.  As a result, her conviction will stand unless it constitutes a "manifest miscarriage of justice"—that is, unless the record contains no evidence of guilt.  *United States v. Sherer*, 770 F.3d 407, 411 (6th Cir. 2014) (quoting *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013)).

The record provides ample evidence to support the conviction.  The record shows that Prather used D.P.'s identity to apply for fraudulent EIDL loans in November 2020.  D.P. has a mental disability, as Prather herself acknowledged.  And he testified to signing the loan applications at his aunt's request without understanding the significance of his actions.  He stated: "I remember I sat down at a bank, but I didn't know exactly what everything was.  I just said anything, she's trustworthy, and I would sign off to anything."  R. 94, Trial Tr., PageID

1134. The loan applications that D.P. signed listed Prather's phone number and email address as the contacts for the business. Yet, despite Prather's heavy involvement, the applications indicated that no one helped D.P. prepare them. Prather also submitted a fraudulent EIDL-loan application that very same day in her own name, thus further implicating herself in "D.P.'s" applications.

Prather's actions following the applications' submission provided further evidence that she was behind the filing of the applications in D.P.'s name. For example, two days after submitting the loan applications, Prather added D.P. to one of her "business" bank accounts, thereby ensuring Prather would have access to any disbursed loans. And in January, Prather reached out to the SBA to check on the status of the applications submitted in D.P.'s name.

Using D.P.'s identity in the November EIDL-loan applications was "at the crux of what" made Prather's scheme "criminal." *Dubin v. United States*, 599 U.S. 110, 114 (2023). That is, D.P.'s "name itself" was "specifically a source of fraud." *Id.* at 123. The SBA had denied Prather's previous EIDL applications. Submitting the loan applications for her businesses under a new name helped Prather obscure the fact that the SBA had already deemed the businesses unworthy of EIDL loans. *See United States v. Abdelshafi*, 592 F.3d 602, 610 (4th Cir. 2010) ("[T]he use of another person's means of identification makes a fraudulent claim . . . much harder to detect and, therefore, more likely to succeed."). The government thus provided evidence that Prather used D.P.'s identity without lawful authority. Letting her convictions stand would be no injustice.

Prather resists this conclusion. She indicates that even if she submitted the applications, D.P. "voluntarily and competently" offered his identifying information for the EIDL loans. Appellant Br. at 30. So, she didn't commit identity "theft" or use D.P.'s identifying information "without lawful authority." *Id.* As evidence of D.P.'s competency, she notes that he had a business degree and was working towards a master's degree. But D.P.'s testimony, along with his receipt of disability benefits and SSI payments, said more about his mental abilities than any college degree could. A jury was surely entitled to believe that Prather took advantage of D.P.'s mental condition to convince him to surrender his identifying information, which she then used to submit fraudulent loans in his name.

Regardless, even if D.P. knowingly and willingly gave his identifying information to Prather, she could still be guilty of aggravated identity theft. This circuit has concluded that a person may act "without lawful authority" under § 1028A even when "the defendant obtained the permission of the person whose information the defendant misused." *United States v. Lumbard*, 706 F.3d 716, 725 (6th Cir. 2013). Under this court's caselaw, then, Prather acted "without lawful authority" when she used D.P.'s identifying information illegally—to submit fraudulent loan applications. *See United States v. Mobley*, 618 F.3d 539, 547–48 (6th Cir. 2010) (remarking that using one's *own* social security number to submit fraudulent applications would be acting "without lawful authority" under § 1028A).

Prather contends that the Supreme Court's recent decision in *Dubin* abrogated this court's cases like *Lumbard* and *Mobley*. But *Dubin* is not Prather's saving grace. The Court in *Dubin* analyzed the meaning of "use" and "in relation to" in § 1028A(a)(1). 599 U.S. at 131. In the process, the Court noted the government's "inconsistent" readings of "without lawful authority"—the government sometimes claimed that defendants "would not violate § 1028A(a)(1) if they had permission to use a means of identification to commit a crime," yet at other times argued that permission to use another's identity would not matter because "no one ever has permission to commit a crime." *Id.* at 128 n.8. Rather than resolve the issue, the Court expressly declined to "reach the proper interpretation of 'without lawful authority.'" *Id.* So *Dubin* left *Lumbard*'s interpretation of that phrase untouched. *See* 706 F.3d at 725. And we remain bound by *Lumbard*. *See Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019); *see also United States v. Parviz*, 131 F.4th 966, 972–73 (9th Cir. 2025) (concluding that *Dubin* did not abrogate cases, such as *Lumbard*, that held actual theft of identity is not required under § 1028A(a)(1)). To be sure, *Dubin* emphasized the significance of theft in aggravated identity theft cases. 599 U.S. at 120–27. But it explained that "identity theft is committed when a defendant uses the means of identification itself to defraud or deceive." *Id.* at 123. That is what happened here: The government presented evidence that Prather instructed her disabled nephew to sign applications containing his identifying information—name, birthday, and social security number—with the aim of cheating the federal government out of hundreds of thousands of dollars. Her aggravated felony convictions present no manifest miscarriage of justice.

B.

Prather next raises two evidentiary challenges.  She argues that aspects of Special Agent Reier's testimony failed to meet Federal Rule of Evidence 701's criteria for lay witnesses.  She also contends that parts of her ex-fiancé's testimony violated Federal Rule of Evidence 404(b)'s bar on impermissible character evidence.

Prather raised neither objection at trial, however, so we review both challenges for plain error.  *United States v. You*, 74 F.4th 378, 388 (6th Cir. 2023).  To survive plain-error review, Prather must show that admitting the challenged testimony was:  "(1) an error; (2) that was clear or obvious; (3) that affected her substantial rights; and (4) that affected the fairness, integrity, or public reputation of the proceedings."  *Id.*

i.

Prather first challenges the admission of lay opinion testimony by Special Agent Frederick Reier, an agent for the Office of the Inspector General for the Social Security Administration.  Under Rule 701, a lay witness's testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A lay opinion on an ultimate issue is generally inadmissible under Rule 701, because it "seldom . . . will meet the test of being helpful to the trier of fact."  *United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) (quoting *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986)).

At trial, the prosecution questioned Reier about his investigatory interview of D.P.  The prosecutor then asked Reier the following:

> Q:  Now, based on your training and experience, as well as your observations of [D.P.'s] body language, demeanor, and manner of responding to your questions, did you make any assessments as to whether [D.P.] had filed or assisted in filing the EIDL applications in his name?
>
> A:  Yes.  I assessed that, while he did give his information voluntarily, he did not have a full understanding—he did not have an understanding of what it was being used for or anything about the EIDL process.

R. 81, Trial Tr., PageID 648–49. Prather argues this testimony failed to satisfy each prong of Rule 701.

We have described lay opinion testimony as that which "results from a process of reasoning familiar in everyday life." *United States v White*, 492 F.3d 380, 401 (6th Cir. 2007) (citation omitted). Expert testimony, by contrast, "results from a process of reasoning [that] can be mastered only by specialists in the field." *Id.* (citation omitted). In cases like this, where a witness is both a specialist and someone "personally involved" in the case, the border between the two is often "far from clear." *Id.* That makes it difficult for a defendant in Prather's position to show that the district court committed "obvious error" in failing to exclude the testimony sua sponte.

But, even if there was clear error here, Prather has not shown "a reasonable probability that," without Reier's testimony, "the outcome of the proceeding would have been different." *United States v. Hobbs*, 953 F.3d 853, 857 (6th Cir. 2020) (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). Other witnesses offered ample evidence that D.P. did not understand the EIDL process. Most prominently, D.P. himself. When the prosecution asked D.P. whether he held any jobs for his aunt in 2019, he responded: "Oh, we're talking 2019, 2020. No. I can remember—let me see. Did I? I can't—I can't remember back then so there's no answer really. I can't remember back then, that far back." R. 94, Trial Tr., PageID 1132. When asked about his familiarity with the EIDL program, D.P. said: "I heard of it. It's like they say grant but it's a loan? But no, not really. I can't describe it to a fifth grader, so I don't know it." *Id.* at 1133–34. And when asked about the loan applications, D.P. stated: "I remember I sat down at a bank, but I didn't know exactly what everything was. I just said anything, she's trustworthy, and I would sign off to anything." *Id.* at 1134.

FBI Agent Ferron Yi likewise testified that D.P. "did not seem like he would be able to run and operate a business" and "seemed very lost" during his interview. R. 81, Trial Tr., PageID 775. And she testified that, "based upon [her] training and experience," she did not believe D.P. filed the EIDL applications bearing his name. *Id.* Prather does not challenge the admission of Yi's testimony.

Accordingly, Agent Reier's testimony that D.P. did not understand the EIDL process was cumulative of other testimony revealing as much. In these circumstances, Prather has not shown a violation of her substantial rights. *See United States v. Rios*, 830 F.3d 403, 416–17 (6th Cir. 2016) (finding harmless error in admitting impermissible testimony because it was cumulative of other testimony).

Prather counters that Reier's testimony nevertheless harmed her because his opinion, coated in an "aura of expertise," must have improperly swayed the jury. Appellant Br. at 37. We reject the implication; to accept it would mean that harm results *any* time "expert" testimony is improperly admitted as lay testimony. But that is not the law. Though we have recognized that the "aura of expertise" accompanying federal agents' testimony can "increase[] the risk" that the jury will be improperly swayed, *United States v. Freeman*, 730 F.3d 590, 599 (6th Cir. 2013), that heightened risk does not necessarily create reversible error. *See Rios*, 830 F.3d at 416–17; *United States v. Ham*, 628 F.3d 801, 805–06 (6th Cir. 2011). What's more, in this case, any aura of expertise present in Reier's testimony was also present in Yi's, which remains unchallenged. *See United States v. Oriedo*, 498 F.3d 593, 604 (7th Cir. 2007). Prather has not shown that Reier's testimony affected her substantial rights.

ii.

Prather next contests the admission of certain testimony by her ex-fiancé, Darrell Willis. Willis testified that Prather and her sister engaged in fraudulent conduct in or around 2013: Prather used Willis's LLC to place a mechanic's lien on a company with which Prather had a dispute, and Prather's sister forged Willis's signature on the lien. Prather objects to this testimony, arguing it was improper character evidence.

Rule 404(b) prohibits the introduction of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character" in order to show that, on another occasion, the person "acted in accordance" with her character. Fed. R. Evid. 404(b)(1). But evidence of past acts is permissible for other listed purposes, such as to prove the absence of mistake. *Id.* 404(b)(2). If the prosecution intends to introduce past-acts evidence for a permissible purpose, it must give reasonable notice to the defendant. *Id.* 404(b)(3).

The government acknowledges that it did not provide "notice [of] Willis'[s] testimony on this subject as potential Rule 404(b) evidence." Appellee Br. at 43. It fleetingly argues that Willis's testimony could nonetheless have been admitted as "background evidence" because the prior fraud involved a company for which Prather sought PPP loans. *Id.*; *see United States v. Sadler*, 24 F.4th 515, 554 (6th Cir. 2022). But the government admits that, given the time between the prior fraudulent lien and the offense conduct, the better course might have been for the government to have given notice of its intent to invoke a 404(b) exception. Even if that is so, the government argues, Prather's challenge cannot surmount plain-error review. We agree because Prather cannot show prejudice.

The record abounds with evidence that Prather committed fraud. She filed PPP loans for six companies. Yet five of the businesses were nonoperational. The one business in operation had only $1,500 in income during 2019. Prather nevertheless sought $616,389 in loans for these companies. Her fraudulent schemes didn't stop there. Prather submitted not one but two rounds of EIDL applications for her purported businesses. After the first batch failed, she dramatically changed the applications' descriptions of the businesses' revenues, workforce size, and ownership in an attempt to secure at least $600,000 in EIDL loans. Prather submitted all these applications even though she had filed for social security benefits in 2019, stating that she had not been self-employed since 2018 and that she was unable to work. Given the overwhelming evidence against Prather, we are confident that Willis's testimony about her past acts had a negligible effect—if any—on the jury's verdict. Prather has not met her burden to show prejudice.

## C.

Next, Prather contests the district court's response to a jury question about the elements of wire fraud. We review a district court's response to a jury question for abuse of discretion. *United States v. Fitzgerald*, 906 F.3d 437, 449 (6th Cir. 2018). An abuse of discretion occurs if the instructions were "confusing, misleading, and prejudicial." *Id.* (citation omitted).

To convict Prather of wire fraud under 18 U.S.C. § 1343, the government had to prove: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in

furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Robinson*, 99 F.4th 344, 354 (6th Cir. 2024) (citation omitted).  During deliberations, the jury inquired about the interstate-communications element, asking whether Prather "need[ed] to know or understand that the wire, radio, or television communications crossed or were going to cross state lines." R. 96, Trial Tr., PageID 1338.  The district court answered "no."

That was not error.  Prather is right to note that when interpreting elements in a criminal statute that are silent as to mental state, courts generally presume that each element requires scienter.  *See Rehaif v. United States*, 588 U.S. 225, 228–29 (2019).  But that presumption does not apply to a criminal statute's jurisdictional elements.  *Id.* at 230; *see also Torres v. Lynch*, 578 U.S. 452, 468 (2016) (explaining that the "default rule" on scienter "flips" when a criminal statute is silent about a jurisdictional element's requisite mental state).  Our sister circuits have explained that the interstate element of the wire fraud statute is jurisdictional.  *See, e.g.*, *United States v. Tum*, 707 F.3d 68, 73 (1st Cir. 2013); *United States v. Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988); *United States v. Taylor*, 942 F.3d 205, 214 (4th Cir. 2019); *United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996); *United States v. Bryant*, 766 F.2d 370, 375 (8th Cir. 1985); *United States v. Jinian*, 725 F.3d 954, 965 (9th Cir. 2013).  And the Supreme Court has suggested its agreement with these circuits.  *See Torres*, 578 U.S. at 468 (citing some of the other circuits' cases approvingly when explaining that "a criminal defendant need not know of a federal crime's interstate commerce connection to be found guilty"); *see also Neder v. United States*, 527 U.S. 1, 20 (1999) (describing the wire fraud statute's interstate-communications requirement as a jurisdictional element).  We agree as well.  The district court correctly informed the jury that Prather didn't need to know the interstate nature of her acts to be convicted of wire fraud.

III.

A.

We turn now to Prather's two objections to her sentence.  Prather first challenges the district court's loss calculation.  Specifically, she says that the court should not have used the definition of "loss" contained in the Sentencing Guidelines' commentary when calculating her

base offense level.  "Whether the district court erred in relying on the Guidelines commentary to calculate a defendant's Guidelines range presents a legal question that we review de novo."  *You*, 74 F.4th at 396.  If the defendant fails to preserve the sentencing objection, however, we review for plain error.  *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc).

Here, Prather objected generally to the 14-level sentencing calculation.  But, as the government notes, the grounds for the objection have shifted—Prather previously argued that the commentary was not *binding* on the district court, but now she argues that the court *erred* by relying on the commentary.  We thus review for plain error.  *See United States v. Sittenfeld*, 128 F.4th 752, 777 (6th Cir. 2025) (noting that a defendant has not preserved an error if he objected on different grounds below).

Section 2B1.1(b)(1) of the Sentencing Guidelines provides that the base offense level for theft and fraud offenses is 6, and courts should increase the offense level "in incremental amounts based on the 'loss' from the offense."  *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021).  At the time of Prather's sentencing, § 2B1.1(b)(1) did not define "loss."[1]  But commentary to the Guidelines did.  It defined "loss" as "the greater of actual loss or intended loss."[2]  U.S.S.G. § 2B1.1 cmt. n.3(A) (U.S. Sent'g Comm'n 2023).  Prather sought $1,216,389 in fraudulent loans but obtained only $19,682.  So, the intended loss of her criminal conduct far exceeded the actual loss.  At sentencing, the district court used the commentary's expansive definition to calculate loss, resulting in a 14-level enhancement, as opposed to a 4-level one.  *See id.* § 2B1.1(b)(1)(C), (H).  Prather says the district court erred in using intended loss to calculate her sentence.  Our caselaw says otherwise.

In *United States v. You*, this court considered a challenge to the Sentencing Commission's definition of "loss" in commentary to § 2B1.1.  74 F.4th at 397–98.  In our

---

[1]As of November 1, 2024, the Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) n.A (U.S. Sent'g Comm'n 2024).  That change occurred after Prather's April 2024 sentencing, so it is inapplicable here.  *Id.* § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."); *see Huff v. United States*, 734 F.3d 600, 608 (6th Cir. 2013).

[2]The commentary defined "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (U.S. Sent'g Comm'n 2023).  It defined "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," even if the harm "would have been impossible or unlikely to occur."  *Id.* § 2B1.1 cmt. n.3(A)(ii).

analysis, we used the *Kisor* framework. *Id.* at 397; *see Kisor v. Wilkie*, 588 U.S. 558, 574–79 (2019). *Kisor* is the Supreme Court's most recent explication of *Auer* deference, which directs courts to defer to an agency's reasonable interpretation of its own genuinely ambiguous regulations. *Kisor*, 588 U.S. at 563; *see Auer v. Robbins*, 519 U.S. 452 (1997). Applying *Kisor*, we concluded in *You* that the Sentencing Commission's definition of loss merits deference. 74 F.4th at 397. As published circuit precedent, *You* binds us and the district court. *See United States v. Cogdill*, 130 F.4th 523, 527 (6th Cir. 2025). Thus, the district court didn't err.

Prather urges otherwise. She first contends that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), which overruled *Chevron* deference, also implicitly overruled *Auer* deference. So, she says, the district court erred by giving *Auer* deference to the commentary's definition of loss. *See United States v. Williams*, 113 F.4th 637, 645 (6th Cir. 2024) (noting that circuit precedent is no longer binding if intervening Supreme Court precedent "mandates modification" of it (citation omitted)).

The problem for Prather is that *Loper Bright* did not overrule *Auer*. To be sure, *Chevron* and *Auer* were cut from similar cloth—like *Auer*, *Chevron* instructed courts to defer to an agency's interpretation of genuinely ambiguous language. *Compare Kisor*, 588 U.S. at 563, *with Loper Bright*, 603 U.S. at 379–80. But under *Chevron*, that language was in congressionally-enacted statutes, not agency-promulgated regulations. *Loper Bright*, 603 U.S. at 379. The Court in *Loper Bright* took special issue with courts relinquishing their duty to interpret statutes, and it overruled only *Chevron*. *Id.* at 385–90, 400–01, 412. Whatever the future of *Auer* deference, as a court of appeals, we are not in the business of overruling Supreme Court precedent. *See Taylor v. Buchanan*, 4 F.4th 406, 408 (6th Cir. 2021); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) (stating that it is the Supreme Court's "prerogative" to "overrul[e] its own decisions" (citation omitted)). So, *Auer* (and *Kisor*) remain good law. And that means *You* does too.

Prather also argues that deferring to the commentary's definition of loss contravenes *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (per curiam) (en banc). There, we held that Guidelines commentary that *adds* to the Guidelines, rather than *interprets* them, is not entitled to judicial deference. *Id.* at 386–87. Prather posits that the commentary's definition of

loss adds to the Guidelines. But we have already held that *You* forecloses this argument too. *United States v. Xu*, 114 F.4th 829, 845 (6th Cir. 2024). The district court thus didn't err.

B.

Finally, Prather challenges the district court's application of a 2-level sentencing enhancement for crimes that involve "vulnerable victim[s]." *See* U.S.S.G. § 3A1.1(b). Section 3A1.1(b)(1) instructs sentencing courts to add two additional offense levels "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." *Id.* At sentencing, the district court determined that D.P. was a vulnerable victim. Prather concedes that she did not object, so we review for plain error. *United States v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014).

Prather first contests the vulnerable victim enhancement by arguing that the government provided insufficient evidence to prove that Prather stole D.P.'s identity. As explained above, however, the government offered plenty of evidence that Prather exploited D.P.'s disability to file fraudulent loan applications in his name. *See supra* II.A. The district court didn't plainly err in concluding as much. *See United States v. Golson*, 95 F.4th 456, 462–63 (6th Cir. 2024) (denying a sentencing-enhancement challenge on plain-error review because the record "support[ed] an inference" that the enhancement applied).

Prather also argues that, regardless of whether she stole D.P.'s identity, he was not a victim of Prather's offense. But, as we noted in *United States v. O'Lear*, "an ordinary English speaker would call a person a 'victim' if the person has been 'tricked, duped, . . . subjected to hardship,' or 'taken advantage of' by a defendant or if the person has been otherwise 'harmed by [the defendant's] crime.'" 90 F.4th 519, 536 (6th Cir. 2024) (alteration in original) (citation omitted). And a victim need not have been "harmed by the specific conduct that made up the elements of the offense"; instead, a person may be the victim of a crime if he was harmed by the defendant's "relevant conduct." *Id.* at 537; *see* U.S.S.G. § 3A1.1 cmt. n.2. Relevant conduct includes acts committed during the commission of the offense of conviction. *O'Lear*, 90 F.4th at 537. And Prather's conduct when committing wire fraud harmed D.P. because the information

in the fraudulent EIDL applications threatened his eligibility for Title II disability benefits and SSI payments. *See id.* at 537–38.

In a last-ditch effort, Prather posits that the district court violated *Loper Bright* and *Havis* in deferring to the commentary's incorporation of "relevant conduct." But, as explained above, our caselaw has likewise relied on the commentary's use of relevant conduct to decide whether a person is a "vulnerable victim" of an offense. *See id.* at 535–39; *United States v. Moon*, 513 F.3d 527, 540–41 (6th Cir. 2008). And our plain-error review dooms Prather's challenge. As we have already explained, *Auer* isn't overruled until the Supreme Court says it is. *See Buchanan*, 4 F.4th at 408. And Prather cites no binding precedent that bars courts from deferring to § 3A1.1's commentary. "A lack of binding case law that answers the question presented will . . . preclude our finding of plain error." *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015). The district court didn't plainly err in concluding that D.P. was a vulnerable victim of Prather's crimes.

\* \* \*

We AFFIRM.