RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee*,

    *v.*

OMAR THOMAS WALA,

          *Defendant-Appellant*.

No. 24-6021

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:23-cr-00059-1—Robert E. Wier, District Judge.

Argued:  October 23, 2025

Decided and Filed:  February 4, 2026

Before:  SUTTON, Chief Judge; CLAY and GIBBONS, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Thomas C. Lyons, THOMAS C. LYONS LAW OFFICES, Lexington, Kentucky, for Appellant.  Gregory Rosenberg, UNITED STATES ATTORNEY'S OFFICE, London, Kentucky, for Appellee.  **ON BRIEF:**  Thomas C. Lyons, THOMAS C. LYONS LAW OFFICES, Lexington, Kentucky, for Appellant.  Gregory Rosenberg, UNITED STATES ATTORNEY'S OFFICE, London, Kentucky, Charles P. Wisdom Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

_____

### OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.  Defendant Omar Wala pled guilty to conspiracy and substantive counterfeiting after manufacturing and selling 16.1 million

counterfeit alprazolam pills on the dark web over a five-year period.  On appeal, Wala challenges the district court's methodology for calculating loss and its application of that methodology under § 2B1.1 of the Sentencing Guidelines.  Wala also challenges the district court's imposition of two sentencing enhancements because it found his offense involved (1) 10 or more victims or mass-marketing and (2) the conscious or reckless risk of death or serious bodily injury.  We affirm the district court's sentence.

**I.**

In November 2023, Wala pled guilty to conspiracy to "manufacture, hold for sale, and to sell counterfeit . . . generic alprazolam pills" under 18 U.S.C. § 371 and 21 U.S.C. §§ 331(i), 333(b)(8).  DE 17, Plea, Page ID 31–32.  Between May 2017 and December 2022, Wala and four codefendants distributed 16.1 million counterfeit alprazolam (the generic form of Xanax) pills across the country.  Wala sold the counterfeit pills on the dark web[1] and other offline channels, and Wala received payments for sales in cryptocurrencies, including bitcoin and Monero.

As part of the conspiracy, Wala designed counterfeit pills meant to replicate the appearance and effect of FDA-approved generic alprazolam.  Wala, without authorization, imprinted marks on the counterfeit pills—s903 (DAVA Pharmaceutical, Inc.), b707 (Breckenridge Pharmaceutical, Inc.), G3722 (Greenstone Limited), and R039 (Teva Pharmaceutical, Inc.)—to mimic the designs of several pharmaceutical manufacturers' generic alprazolam pills.  Wala also manufactured the counterfeit pills with "benzodiazepine-class drugs other than alprazolam," including clonazolam and etizolam, "to replicate the [drug's] effects."  DE 17, Plea, Page ID 33.  Clonazolam and etizolam were not scheduled as controlled substances at the time of the offense.[2]  After manufacturing the counterfeit pills, Wala sold them in large quantities to buyers (whom Wala referred to as "drug dealers") on the dark web.  DE 137, PSR (Sealed), Page ID 724–25, 729, 733.  Wala marketed the counterfeit pills as "identical to pharma

---

[1]The "dark web" is a "sophisticated, anonymous internet network used both by criminals and by other individuals who, for whatever reason, do not want to be identified."  *United States v. Tagg*, 886 F.3d 579, 582 (6th Cir. 2018).

[2]On July 26, 2023, the DEA on an emergency basis scheduled clonazolam and etizolam as Schedule 1 controlled substances "to avoid imminent hazard to the public safety."  Temporary Placement of Synthetic Benzodiazepines in Schedule 1, 88 Fed. Reg. 48,112 (Jul. 26, 2023).  This scheduling post-dated Wala's offense.

in [s]ize/[t]aste/[c]olor" and "the best replicas on the market."  U.S. Ex. 6, at 00:20.  Wala's dark web buyers then resold the pills to other individuals.  Wala admitted that his offense involved fraud and "caused a loss to the various pharmaceutical companies [that] properly and legally market and sell alprazolam pills."  DE 17, Plea, Page ID 32–34.

In Wala's plea, the government "reserve[d] the right to argue that the loss amount under U.S.S.G. § 2B1.1 [should] include the amount paid for the counterfeit alprazolam pills, with no credit provided for the value of the pills."  *Id.* at 34.  Likewise, Wala reserved the right to argue that the court should determine the loss amount under § 2B1.1 "based on the fair market value of the generic alprazolam that was copied" as part of the conspiracy.  *Id.*  Wala also reserved his right to appeal the sentence.  Both parties stipulated that "they may object to or argue in favor of other calculations."  *Id.* at 33.

The United States Probation Office ("USPO") recommended in the Presentence Report ("PSR") that Wala's base offense increase by eighteen levels because it found he caused his victims losses greater than $3,500,000 but less than $9,500,000.  Both Wala and the government objected to the USPO's recommendation.  Wala argued that the court should find that losses exceeded $550,000 but were less than $1,500,000, for a fourteen-level increase, while the government argued the loss amount exceeded $25,000,000, for a twenty-two-level enhancement.  Wala also objected to the USPO's recommendation that the district court apply a two-level increase because the offense involved 10 or more victims or was committed through mass-marketing, see U.S.S.G § 2B1.1(b)(2)(A)(ii), and a two-level enhancement because the offense involved the conscious or reckless risk of death or serious bodily injury, see *id.* § 2B1.1(b)(16)(A).[3]

The district court held a joint evidentiary hearing relating to Wala's and his codefendants' objections to the loss calculations and the various enhancements.  In Wala's view, the conspiracy's victims were the pharmaceutical companies whose legitimate alprazolam was

---

[3]The USPO also recommended a two-level sophisticated means enhancement, a four-level leadership enhancement, and a two-level obstruction of justice enhancement.  The government ultimately agreed that the obstruction of justice enhancement should not apply, and it was therefore removed from Wala's Guidelines calculations.  Wala does not challenge the district court's application of the sophisticated means and leadership enhancements on appeal.

copied. Wala thus argued that the court should estimate loss to the drug manufacturers by calculating the "wholesale acquisition cost," which he claimed represented the pills' "fair market value." DE 157, Evid. Hr. Tr., Page ID 979–80. In contrast, the government contended that the relevant market was the "illicit market, the street market," and the "price paid by the end-user [was] the appropriate" measure because, "at its core, this offense was using th[e] imprint of a legitimate manufacturer to create a counterfeit pill." *Id.* at 969, 971–72. Because Wala did not sell through legal channels, the government argued that the market in which the drug manufacturers sold their legitimate pills was "wholly irrelevant" to calculate loss. *Id.* at 969.

The district court agreed with the government. It emphasized that the conspiracy's "logical goal, shown through the effort to mimic the behavior of generic alprazolam, was to fool the ultimate user—the street buyer [who] purchase[d] and ingest[ed] the counterfeit pill, thinking and believing it to be an actual product of one of the legitimate manufacturers." DE 96, Order, Page ID 459. The court further found that Wala and his coconspirators "made the fake pills knowing and intending that they would end up going to street users" and that they were aware that mistakes in copying the legitimate alprazolam directly impacted their and their drug dealer buyers' sales. *Id.* Specifically, it explained that "poor stamping, incomplete marking, or relative drug 'weakness' would make it hard to move product on the street." *Id.* The court therefore determined that "[f]ailing to account for losses to those defrauded buyers, who hardly got what they paid for, simply would ignore the true operation of and harm from the offense." *Id.* at 464.

Applying the definition of "loss" from Guidelines Commentary Application Note 3(E)(v),[4] the district court estimated a $2 price per pill "as a conservative street price for the

---

[4]The 2023 Sentencing Guidelines were in effect when the district court ruled on Wala's sentencing objections on June 18, 2024. In that version of the Guidelines, the relevant Application Note was located at Application Note 3(F)(v). The district court relied on the 2023 Sentencing Guidelines in deciding Wala's objections to the loss calculations. But because Wala was sentenced on November 5, four days after the 2024 Sentencing Guidelines took effect, the 2024 Sentencing Guidelines control our analysis. *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). And here, the district court properly relied on the 2024 Guidelines when it sentenced Wala. Wala and the government, however, erroneously contend that we should apply the 2023 Sentencing Guidelines to Wala's sentence. Nonetheless, because the 2024 Guidelines apply, we refer to the relevant special rule as Application Note 3(E)(v), which is where the rule was located at the time Wala was sentenced. *See* U.S.S.G. § 2B1.1(b) cmt. n.3(E)(v) (U.S. Sent'g Comm'n 2024). Although the special rule moved to a new subsection in the 2024 Guidelines, its language is identical to the previous version in the 2023 Guidelines Commentary. *Compare* U.S.S.G. § 2B1.1(b) cmt. n.3(E)(v) (U.S. Sent'g Comm'n 2024), *with* U.S.S.G. § 2B1.1(b) cmt. n.3(F)(v) (U.S. Sent'g Comm'n 2023).

counterfeit pills." *Id.* The district court chose that price per pill after considering Wala and his codefendant's text messages, as well as statements from a confidential informant, which indicated "the street price range ran from as low as $2 per pill to $3, $4, $6, and even higher." *Id.* It therefore reasoned that the $2 per pill was "a restrained measure for what defrauded street purchases lost in their misplaced bargain for generic alprazolam pills that actually were counterfeit." *Id.* at 465. The district court also concluded that two sentencing enhancements applied: one for 10 or more victims or mass-marketing, and one for conscious or reckless risk of death or serious bodily injury.

At sentencing, the district court applied a base offense level of six and increased it by 22 levels based on a loss calculation of approximately $32 million ($2 per pill times 16.1 million pills).[5] The court also applied the two-level victim numerosity or mass-marketing enhancement, two-level sophisticated means enhancement, two-level conscious or reckless risk of death or serious injury enhancement, and a four-level enhancement for being a leader or organizer of the conspiracy. After subtracting three points for acceptance of responsibility, it determined that Wala's total offense level was 35. Noting that Wala's criminal history category was II, the court found the recommended imprisonment range was 188 to 235 months. Because that range exceeded the statutory maximum, the court sentenced Wala to 60 months in prison on Count One and 90 months on Count Two to run concurrently for a total sentence of 90 months' imprisonment. Wala timely appealed.

## II.

Wala first challenges the district court's loss calculation. He argues that the district court incorrectly applied Application Note 3(E)(v) instead of the general definition for loss in the Sentencing Guidelines. Moreover, to the extent the district court applied the correct methodology, Wala argues that it erred in calculating his loss amount.

The government has "the burden to prove the amount of the loss by a preponderance of the evidence." *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). Although the Court reviews a district court's loss determination "under a deferential clear-error standard," it must

---

[5]Wala concedes that his conduct involved 16.1 million pills over five years.

"review de novo the district court's methodology for calculating" the loss and its interpretation of the Guidelines. *Id.* (internal quotations omitted). A district court's error in calculating loss "typically requires remand." *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010). "An error in calculating the Guidelines range is harmless only if the government can show 'with certainty that the error at sentencing did not cause the defendant to receive a more severe sentence.'" *United States v. You*, 74 F.4th 378, 399 (6th Cir. 2023) (emphasis removed) (quoting *United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009). Having considered each of Wala's arguments under the appropriate standard of review, we affirm the district court's loss calculation.

### A.

For fraud offenses, a defendant's base offense level starts at six, U.S.S.G. § 2B1.1, and increases "in incremental amounts based on the loss from the offense." *You*, 74 F.4th at 397 (citation omitted). Loss is defined in the Sentencing Guidelines as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) table note (A) (U.S. Sent'g Comm'n 2024).[6] However, the Guidelines Commentary instructs courts to apply "[s]pecial [r]ules" to "assist in determining loss in [certain indicated] cases[.]" *Id.* § 2B1.1 cmt. n.3(E). One such rule involves defendants who participated in "[u]nlawful [m]isrepresentation [s]chemes." *Id.* at. n.3(E)(v). Application Note 3(E)(v) reads:

> In a case involving a scheme in which . . . (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

*Id.*

---

[6]In the 2023 Sentencing Guidelines, the term "loss" was undefined in the Guidelines's text, and the Sentencing Commission provided guidance on how to calculate loss in the commentary accompanying § 2B1.1. *See Riccardi*, 989 F.3d at 481. But because Wala was sentenced after the 2024 Sentencing Guidelines took effect, the 2024 Guidelines control our analysis. *See* U.S.S.G. § 1B1.11(a). Loss is defined in the 2024 Sentencing Guidelines as the "greater of the actual or intended loss." *Id.* § 2B1.1(b) table note (A). Like the 2023 Sentencing Guidelines, however, Application Note 3(E) instructs courts to use special rules to determine loss in certain cases, including when the defendant's offense involved an "[u]nlawful [m]isrepresentation [s]cheme[]." *Id.* § 2B1.1 cmt. n.3(E)(v).

The district court applied Application Note 3(E)(v) to calculate loss and found that Wala triggered subsections (II) and (III).  On appeal, Wala makes four arguments against the district court's chosen methodology.  First, he argues that district court erred in deferring to § 2B1.1's commentary because the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), casts doubt on whether courts should continue deferring to the Guidelines Commentary at all.  Second, Wala argues that the district court should not have deferred to Application Note 3(E)(v) because it falls outside the "zone of ambiguity" of the term "loss" in § 2B1.1.  Third, he contends that the district court should not have applied Application Note 3(E)(v) to his offense.  Fourth, Wala asserts we should apply the rule of lenity and choose the methodology most favorable to him.  We review the district court's methodology for calculating loss and its interpretation of the Guidelines de novo.  *Riccardi*, 989 F.3d at 481.

**1.**

Wala argues that the district court should not have deferred to any commentary for U.S.S.G. § 2B1.1 when determining the loss amount.  Specifically, he argues that this court may not defer to the Guidelines Commentary at all after the Supreme Court's decision in *Loper Bright*.  Although Wala acknowledges that *Loper Bright* did not overturn *Kisor v. Wilkie*, 588 U.S. 558 (2019), he nevertheless contends that *Kisor* rests on the "dismantle[ed] . . . foundation" of *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and thus calls into question *Kisor*'s legitimacy.  CA6 R. 46, Appellant's Br., at 21.

Wala's challenge fails for two reasons.  First, Wala waived his argument that the district court should not have deferred to the Guidelines Commentary because he expressly rejected making that argument at his sentencing hearing in November 2024.  Wala initially suggested that *Loper Bright* "would have informed the Court's ruling," and "would help support the defense position with respect to the particular subsection of 2B1.1 that was applied by the Court."  DE 160, Sent. Hr. Tr., Page ID 1155.  Seeking clarification, the district court questioned the parties: "You're not sitting there thinking . . . that case is going to upend the entirety of [the court's] sentencing rubric back from June?"  *Id.* at 1156–57.  Wala responded that the court "was correct" and explained that he was not challenging its reliance on the Sentencing Guidelines altogether. *Id.* at 1157.  Instead, he limited his *Loper Bright* challenge to the court's "relia[nce] on a number

of FDA regulations with respect to [G]uideline[s] [C]ommentary that the Court had applied with respect to the methodology of calculating loss." *Id.* In response, the district court acknowledged the argument but explained that there was "not a motion filed or something to really tee the issue up." *Id.* at 1158. Therefore, the court found Wala preserved the argument "to [the] generic extent [that it] ha[d] been made" such that it "might call into question [the] validity of [FDA] regulations in some circumstances and that could potentially apply here." *Id.*

By expressly limiting his *Loper Bright* challenge to specific FDA regulations, Wala waived his right to assert on appeal that the district court should not have deferred to the Sentencing Guidelines at all. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (quoting *United States v. White*, 920 F.3d 1109, 1122–23 n.4 (6th Cir. 2019) (Clay, J., concurring) (explaining that a defendant waives argument when they "stat[e] that they are not pressing an argument")); *United States v. Tasis*, 696 F.3d 623, 625–26 (6th Cir. 2012) (holding argument is "waived" where party "expressly declined" to pursue remedy at the district court and therefore could not "now ask for [that same remedy] on appeal").

Second, Wala's argument is foreclosed by our recent decision in *United States v. Prather*, 138 F.4th 963 (6th Cir. 2025), which Wala concedes addressed "*Loper Bright*'s application to the definition of 'loss' in the [Sentencing] Commentary." CA6 R. 57, Reply Br., at 9. There, the defendant claimed that *Loper Bright*, "which overruled *Chevron* deference, also implicitly overruled *Auer* deference." 138 F.4th at 974. The defendant argued that "the district court erred by giving *Auer* deference to the commentary's definition of loss" in the context of § 2B1.1. *Id.* We rejected the argument and held that "*Loper Bright* did not overrule *Auer*." *Id.* at 974. We explained that "[w]hatever the future of *Auer* deference, as a court of appeals, [our court] is not in the business of overruling Supreme Court precedent." *Id.* at 975. Therefore, "*Auer* (and *Kisor*) remain good law." *Id.* Because "a panel of this Court cannot overrule the decision of another panel," *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), we reject Wala's argument.

**2.**

Wala also argues that the district court erred when it applied Application Note 3(E)(v) because it falls outside the "zone of ambiguity" of the term "loss" in § 2B1.1.  Wala did not, however, raise this argument before the district court and instead makes it for the first time on appeal.  Thus, we review Wala's argument for plain error.  *United States v. Russell*, 26 F.4th 371, 375–76 (6th Cir. 2022).

Under *Kisor*, courts may defer to an agency's regulation only when "that regulation is 'genuinely ambiguous, even after [the] court has resorted to all the standard tools of interpretation' to eliminate that ambiguity."  *Riccardi*, 989 F.3d at 485 (quoting *Kisor*, 588 U.S. at 573).  However, even when the meaning of a term in the Guidelines is not "clear," courts may defer to the Guidelines Commentary only when that guidance falls within the Guidelines's "zone of ambiguity."  *Id.* (quoting *Kisor*, 588 U.S. at 576).  This means that courts may not defer to the Guidelines Commentary when "[n]o reasonable person would define" the relevant Guidelines language in the way that the commentary commands.  *Id.*

For example, we considered in *Riccardi* whether to give deference to § 2B1.1's commentary about how to calculate loss in the context of stolen credit cards.  *Id.*  There, the term "loss" was undefined in § 2B1.1.  *Id.* at 486.  The specific commentary, Application Note 3(F), "instruct[ed] that the loss 'shall be not less than $500'" for each card.  *Id.* at 482.  The defendant argued that this $500 figure was not entitled to deference because that definition did not fall within the Guidelines's "zone of ambiguity."  *Id.* at 480.  We agreed, reasoning that "[n]o reasonable person would define the 'loss' from a stolen gift card as an automatic $500."  *Id.* at 486.  Instead, the amount of the loss would "turn on such fact-dependent things as the value of the gift card or the costs of replacing it."  *Id.*  Therefore, "[t]he commentary's bright-line $500 loss amount [could not] 'be derived from [§ 2B1.1] by a process reasonably described as interpretation.'"  *Id.* at 487 (quoting *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996)).

Wala cites *Riccardi* in arguing that we should reject Application Note 3(E)(v) because it creates a "new[] substantive rule" that is "untethered to the text."  CA6 R. 57, Reply Br., at 1–2.

Wala contends that "[l]ike the $500 minimum, no reasonable person would fashion a loss as the full 'amount paid' for property that either required regulatory approval" or was falsely represented as having received regulatory approval. *Id.* at 2.

Under plain error review, Wala has the burden to show that there was "(1) an error, (2) that was obvious or clear, (3) that affected [his] substantial rights, and (4) that affected the fairness, integrity, or public reputation of [his] judicial proceedings." *United States v. Johns*, 65 F.4th 891, 893 (6th Cir. 2023). To be plain, "the error must be both clear or obvious, rather than subject to reasonable dispute, as well as clearly contrary to the law at the time of appeal." *United States v. Tellez*, 86 F.4th 1148, 1154 (6th Cir. 2023) (citation modified). "A lack of binding case law that answers the question presented will also preclude our finding of plain error." *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015).

Wala cannot meet this high bar. Even if the district court erred by applying Application Note 3(E)(v), "any such error was neither obvious nor clear." *Tellez*, 86 F.4th at 1154. Neither the Supreme Court nor the Sixth Circuit has considered whether Application Note 3(E)(v) falls outside of § 2B1.1's "zone of ambiguity." And none of our sister circuits have considered the issue. There is thus "[a] lack of binding case law that answers the question presented" and "no intervening change in the law has made this error plain on appellate review." *Al-Maliki*, 787 F.3d at 794. We therefore reject Wala's forfeited challenge under plain error review.[7]

**3.**

Wala next challenges the district court's conclusion that subsections (II) and (III) of Application Note 3(E)(v) properly applied to his conduct. This argument fails.

---

[7]Wala concedes that under our existing precedent, the term "loss" in § 2B1.1 is ambiguous, so courts may defer to the Guidelines Commentary if it falls within the Guidelines's "zone of ambiguity." Oral Argument, Appellant, at 11:45–12:04 ("We concede that the commentary be used still under the *You* case and some more recent cases."); CA6 R. 46, Appellant's Br. at 20. Wala does not, however, argue that the 2024 Sentencing Guidelines amendments to § 2B1.1, which moved the general definition for loss from the commentary to the Guidelines, require that we reconsider our decisions in *You* and its progeny. Thus, we do not address whether the term "loss" as used in § 2B1.1 remains ambiguous following the 2024 amendments.

Subsection (II) applies when the defendant's scheme involves "goods [which] were falsely represented as approved by a governmental regulatory agency." U.S.S.G. § 2B1.1(b)(1) n.3(E)(v)(II). By copying the imprints of legitimate, FDA-approved versions of alprazolam pills, Wala falsely represented his pills as being approved by the FDA. *See* DE 17, Plea, Page ID 32 (admitting the counterfeit pills "falsely purported or [were] represented to be the product of" the legitimate alprazolam manufacturers). The counterfeit pills were "designed to substantially replicate the appearance of alprazolam pills produced by the drug manufacturers." *Id.* Indeed, the record shows that street-level acceptance of Wala's counterfeit pills depended on the copied imprints being stamped correctly. *See* U.S. Ex. 1, at 1 (showing that Wala's drug dealer client was "losing clientele because . . . the print [was] missing off [the] majority of them"); U.S. Ex. 2, at 1 (complaining that when pill press labels were "missing" that it was "hard to move them to people"); U.S. Ex. 3, at 1 (noting that the "press" makes the pills "look really sketchy and [people] think there's fent[anyl] in them"). The counterfeit marks represented to street-level buyers that the pills were FDA-approved and therefore a safe, "known product with set attributes." DE 96, Order, Page ID 462. This suffices to trigger subsection (II).

Wala argues that subsection (II) does not apply because the government did not show he "affirmatively represent[ed]" the pills as FDA-approved. CA6 R. 57, Reply Br., at 4–5. But a representation can be "affirmative" even when conveyed through conduct. Misrepresentation is defined as "a presentation of fact—either by words or by conduct—made to induce someone to act." *Representation*, Black's Law Dictionary (12th ed. 2024); *see also Representation*, Black's Law Dictionary (7th ed. 2000); *Representation*, Webster's Unabridged Dictionary 1634 (2d. ed. 2002) ("to express or designate by some term, character, symbol[,] or the like"). By copying the marks of legitimate alprazolam pills, Wala conveyed the false impression that the counterfeit pills were FDA-approved. This, in turn, contributed to street-level buyers purchasing the pills, which they might not have done had they known that the pills were counterfeit.

Despite this, Wala asserts that subsection (II) applies only to defendants who "affirmatively represent they manufactured a legitimate product that has been through the rigorous testing and approval process required by administrative agencies." CA6 R. 57, Reply Br., at 4. Wala cites *United States v. Milstein*, 401 F.3d 53, 59 (2d Cir. 2005), to argue that the

special rule "addresses a fraudulent doctor or a pseudo-pharmaceutical product that a defendant sought to sell to an unwitting public as an item subjected to regulatory inspection and approval." CA6 R. 57, Reply Br., at 4. But Wala's attempt to distinguish *Milstein* is unpersuasive. There, the defendant purchased drugs for distribution outside the United States, removed their factory packaging, and "repackaged them with forged labels and packaging materials closely resembling those of drugs produced in accordance" with federal law. 401 F.3d at 59. Like Wala, the *Milstein* defendant did not *verbally* represent that his pills were FDA-approved but rather falsely represented them as such through counterfeit labeling. *Id.* at 59, 74.

Wala also argues that he did not falsely represent his pills as having regulatory approval because he sold the drugs on the dark web and the dark web "is the last place consumers would venture to purchase FDA approved drugs." CA6 R. 47, Appellant's Br. at 13. This argument fails for several reasons. First, Wala's pills were resold to street-level users who were unaware that they were counterfeit. Therefore, even if Wala's buyers on the dark web knew the pills were not FDA-approved, the ultimate end-users of the scheme were still deceived. Second, Wala admits that he also sold some counterfeit pills on offline channels. Thus, even assuming Wala's dark web buyers were not deceived, Wala's scheme may have tricked buyers who purchased the pills in other markets. And third, although the "[t]he 'dark web' is a sophisticated, anonymous internet network," *Tagg*, 886 F.3d at 582, it is conceivable that at least some consumers on the dark web might contemplate buying FDA-approved drugs. For example, a buyer on the dark web could purchase an FDA-approved drug (e.g., Xanax or generic alprazolam) with the intent to illegally consume or resell it.

Wala also triggered subsection (III). Subsection (III) applies where a defendant's scheme involved "goods for which regulatory approval by a government agency was required but not obtained." U.S.S.G. § 2B1.1 cmt. n.3(E)(v)(III). A "drug" is an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C § 321(g)(1)(B). A "new drug" is "[a]ny drug" not "generally recognized [among experts] as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." *Id.* § 321(p)(1). A "new drug" must obtain FDA approval before it enters the market. *See In re Darvocet, Darvon, & Propoxyphene Prods. Liability Litig.*,

756 F.3d 917, 922 (6th Cir. 2014). Here, Wala concocted a new drug comprised of "benzodiazepine-class drugs other than alprazolam to replicate the effects of alprazolam." DE 17, Plea, Page ID 33. And these new drugs were not FDA-approved. *Id.* Wala violated subsection (III) because he was required to secure FDA approval before distributing 16.1 million unapproved pills into the market.

Wala maintains that subsection (III) does not apply because he manufactured a counterfeit drug rather than a drug as defined under federal law. He contends that the "counterfeit alprazolam pills . . . were contraband from their creation, and they were never eligible for regulatory approval." CA6 R 57, Reply Br., at 5. But Wala pled guilty to conspiracy to sell counterfeit drugs. A counterfeit drug is by definition a drug. *See* 21 U.S.C. § 321(g)(2) (defining a counterfeit drug as a "drug" that "bears the . . . identifying mark [or] imprint" of a drug manufacturer). And although it is true that the counterfeit drugs here were contraband, they were contraband precisely because they never received FDA approval—not because they were never eligible for FDA approval at all.

**4.**

"When, in criminal cases, the tools of statutory interpretation do not resolve a question, where significant doubt or uncertainty lingers," we construe the provisions in the defendant's favor. *United States v. Canelas-Amador*, 837 F.3d 668, 674 (6th Cir. 2016). The rule of lenity, however, "plays 'a very limited role,' applying 'only when after seizing everything from which aid can be derived, the statute is still grievously ambiguous.'" *United States v. Clark*, 46 F.4th 404, 415 (6th Cir. 2022) (quoting *Wooden v. United States*, 595 U.S. 360, 377 (2022) (Kavanaugh, J., concurring)). Wala argues that we should apply the rule of lenity here because Application Note 3(E)(v) is grievously ambiguous. Although this case involves difficult questions, we will not apply the rule of lenity because we can reach "a reasoned interpretation of the text . . . by 'exhaust[ing] all the tools of statutory interpretation.'" *Clark*, 46 F.4th at 415 (quoting *Wooden*, 595 U.S. at 377 ((Kavanaugh, J., concurring)).

Moreover, lenity is a "poor fit" in this case because Wala had fair notice that his conduct violated federal law. *See United States v. Fitzgerald*, 906 F.3d 437, 448 (6th Cir. 2018).

Application Note 3(E)(v) covers "[u]nlawful [m]isrepresentation [s]chemes," including where "goods were falsely represented as approved by a governmental regulatory agency." U.S.S.G. § 2B1.1 cmt. n.3(E)(v). Wala participated in a fraudulent scheme in which he manufactured and sold 16.1 million counterfeit pills meant to replicate the appearance and effect of FDA-approved generic alprazolam. And Wala operated on the dark web and accepted cryptocurrency to avoid federal scrutiny. Wala therefore had more than "fair warning that [his] conduct might subject [him] to criminal sanction[s]." *Fitzgerald*, 906 F.3d at 448.

**B.**

We consider next whether the district court clearly erred in determining the loss amount. Wala's arguments center on two points: that the district court erred first by concluding that the street market was the relevant market to calculate loss; and second by estimating $32 million as an approximate total loss amount.

Because loss is difficult to calculate in a fraud case, a "district court need only make a reasonable estimate of the loss using a preponderance of the evidence standard." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (citation modified). "[W]e treat the district court's application of its chosen formula to this case's evidentiary record as a finding about the historical facts reviewed for clear error." *United States v. Agrawal*, 97 F.4th 421, 436 (6th Cir. 2024). Thus, we defer to the district court's loss calculation so long as it is "plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022). A party challenging the district court faces a "heavy burden," and must show "that the [district court's] evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations." *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994).

**1.**

Under Application Note 3(E)(v), "loss shall include the *amount paid* for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." (emphasis added). The question thus becomes: "the amount paid" by whom? Although Wala participated in the wholesale market on the dark web, the district court valued the total loss at approximately $32 million, multiplying the estimated street price of

$2 per pill by the 16.1 million counterfeit pills that Wala distributed.[8] In using the consumer market, the district court offered the following justification:

> Here, the fraudulence of Defendants' product travelled all the way to the consumer market. The very point of faking a pill's provenance is to trick the eventual pill taker. Whether wholesale customers were also fooled, in whole or in part, perhaps can be debated. There is no doubt that the entire scheme hinged on street-level acceptance, that buyers in the street would mistake the stamped, shaped, colored, embittered pills for the real thing and be satisfied. As such, what they paid, in *that* market, properly registers in the loss. As is always the case relative to the loss table, the Court must "only make a reasonable estimate of the loss." *See* Guidelines Manual § 2B1.1 cmt. n.3(C). The Court views the loss as properly encompassing the street-level buyers, the true ultimate victims, of the counterfeit pill production.

> The victim definition in § 2B1.1 and the values of § 1B1.3 fortify this view. For purposes of § 2B1.1, a victim is "[a]ny person who sustained any part of the actual loss" under (b)(1). U.S.S.G. § 2B1.1 cmt. n.1. Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(1). Further, "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* § 2B1.1 cmt. n.3(A)(iv). Is it foreseeable that a product intended to dupe the ultimate user—to mimic in all respects the copied product, here, one to be ingested by a person—would fulfill its mission? Yes, is the only answer. Further, in figuring the loss calculation to reflect the indispensable victims of the offense, the end users, the Court also is following § 1B1.3 relevant conduct principles. That section makes plain that "specific offense characteristics . . . shall be determined on the basis of the following: . . . (3) all harm that resulted from the acts and omissions specified in subsection (a)(1) and (a)(2) above, and *all harm that was the object of such acts and omissions*." [*Id.*] § 1B1.3(a)(3) (emphasis added).

> The jointly undertaken criminal activity here specifically intended to [make] counterfeit alprazolam and pass it off as authentic. This targeted the terminal users, the consuming buyer on the street. Harm to that buyer—specifically, fraud against that buyer—was the plain object of, was in furtherance of, and was fully foreseeable to conspiracy members. The street buyers thought they were purchasing authentic generic alprazolam made by a proper manufacturer.

---

[8]During the evidentiary hearing on loss calculations and sentencing enhancements, the district court asked whether it should for account for each level of loss among the potential victims. It questioned whether "[i]t [was] right to say the [G]uidelines really ought to be sensitive to every loss category and sort of be . . . universal and inclusive." DE 157, Evid. Hr. Tr., Page ID 971. The government answered that even though that argument was plausible, it was "not advocating for that more aggressive position," but instead thought "the price paid by the end-user is the appropriate one to use because . . . at its core, this offense was using that imprint of a legitimate manufacturer to create a counterfeit pill." *Id.* at 971–72.

What they bought, instead, was an intermixture of unapproved benzos and a filler, pressed by amateurs in a storage unit and made to seem and behave like the real thing. Failing to account for losses to those defrauded buyers, who hardly got what they paid for, simply would ignore the true operation of and harm from the offense. That would ignore actual loss and the dictates of § 2B1.1. *See United States v. You*, 74 F.4th 378, 398 (6th Cir. 2023) (referencing, in proper construction of § 2B1.1 to capture relative culpability, § 1B1.3 principle "requiring that a defendant's offense level be determined in part by 'all harm that resulted' from the defendant's crimes and by 'all harm that was the object of such acts'").

DE 96, Order, Page ID 463–64 (internal footnote omitted).

The district court's reliance on the counterfeit pills' street price was "plausible" based "on the record as a whole." *Estrada-Gonzalez*, 32 F.4th at 614. Wala manufactured counterfeit pills and sold them wholesale to drug dealer buyers. Wala was aware that his buyers would then resell the pills to other individuals. And the record suggests that Wala knew that his buyers' ability to resell the counterfeit pills to unsuspecting end-users depended on his accurately copying the provenance of the legitimate pills. *See* U.S. Ex. 1, at 1 (explaining that wholesaler client was "losing clientele because . . . the print [was] missing off majority of them"); U.S. Ex. 2, at 1 (complaining that when pill press labels were "missing" it became "kinda hard to move them to people"); U.S. Ex. 3, at 1 (noting that the "press" makes the pills "look really sketchy and [people] think there's fent[anyl] in them"). Indeed, Wala marketed his counterfeit pills on the dark web as "identical to pharma in [s]ize/[t]aste/[c]olor" and "the best replicas on the market." U.S. Ex. 6, at 00:20. The district court therefore reasonably concluded that "[h]arm to that buyer—specifically, fraud against that buyer—was the plain object of, was in furtherance of, and was fully foreseeable to conspiracy members." DE 96, Order, Page ID 464.

Meanwhile, Wala argues that the district court should not have applied the street price of the counterfeit pills because that figure is reserved for cases involving controlled substances. In "case[s] involving controlled substances," the Guidelines Commentary defines "loss" as "the estimated street value of the controlled substances." U.S.S.G. § 2B1.1 cmt. n.3(E)(vi). Even though the drugs that Wala used to manufacture the counterfeit pills were not controlled substances when the conspiracy occurred, nothing in Application Note 3(E)(vi) precludes courts from using "estimated street value" as the reasonable estimate of loss in other cases.

Application Note 3(B) explains that courts "need only make a reasonable estimate of the loss" and should consider, among other things, "[t]he fair market value of the property unlawfully . . . copied." Here, the district court plausibly found that Wala's fraud against the street buyers was the "plain object of the conspiracy." DE 96, Order, Page ID 464. Thus, it was reasonable for the district court to conclude that the counterfeit pills' street price also represented the fair market value of the property in the market to which Wala's fraud was targeted. This conclusion is bolstered by the fact that Wala manufactured his pills to pass for controlled substances, which, if not counterfeit, seemingly would have required the district court to apply the estimated street value of the drugs. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(vi) ("In a case involving controlled substances, loss is the estimated street value of the controlled substances.").

Using the counterfeit pills' street value is also reasonable because Wala's fraud was intricately linked to the retail market. We agree that the relevant market is the one to which the victim had access, as "loss reflect[s] the seriousness of the injury to the victim." Fed. Sent. L. & Prac. § 2B1.1 (2025 ed.). In *United States v. Warshawsky*, we rejected a district court's finding that the retail market was the "proper market for valuation purposes . . . because the retail market has literally no connection to this case." 20 F.3d 204, 213 (6th Cir. 1994). We noted that "although some cases require a sentencing judge to choose between a variety of markets affected by the defendant's criminal activity," every participant in *Warshawsky*, including the victim, "interacted in the wholesale market." *Id.* In contrast, in *United States v. Ellerbee*, we applied the retail market value of the goods because the victim "act[ed] in the retail market place by selling to consumers." 73 F.3d 105, 109 (6th Cir. 1996). There, we distinguished *Warshawsky* because it "dealt with fraud amongst wholesalers, and the victim was a player in the wholesale market; thus in that case, it was inappropriate to use the retail value of the goods." *Id.* at 108–09.

Wala also argues that the district court should have relied on the plea deal in *United States v. Verbowski*, 4:22-cr-00258-SRC-NAB (E.D. Mo. May 4, 2022), as well as his own plea, to find that the "amount paid" was the price of generic Xanax sold to consumers with valid prescriptions. In *Verbowski*, the defendant pled guilty to violations under 18 U.S.C. § 371 and 21 U.S.C. § 331(i)(3) in a scheme that involved the same counterfeit pills and some of the pharmaceutical companies at issue here. The plea agreement calculated loss as the "average

price that actual generic Xanax pills are sold to consumers with valid prescriptions." CA6 R. 47, App'x at 6. But even if persuasive, *Verbowski*'s plea bound only the parties in that case. *See id.* at 1 ("This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri."). Nor did Wala's own plea—where he admitted that his conduct "caused a loss to the various pharmaceutical companies [that] properly and legally market and sell alprazolam pills"—bind the district court. DE 17, Plea, Page ID 32–33. Indeed, both parties stipulated that they "may object to or argue in favor of other calculations." *Id.* at 33.

Wala finally argues that the district court's consideration of the pills' street value was contrary to the commentary's plain language. But the record shows that Wala's scheme depended on his counterfeit pills tricking end-users in the illicit drug market, not purchasers of generic alprazolam in legitimate markets. Thus, it was not clearly erroneous for the district court to apply the street price in this context.

**2.**

After determining that the relevant market was the price paid by end-user, the district court concluded that "$2 [was] a conservative street price for the counterfeit goods." DE 96, Order, Page ID 464. Noting that Wala was "responsible for" 16.1 million pills, at "$2 per pill," the district court concluded that the loss was approximately $32 million, which corresponded to a 22-level offense level increase. DE 160, Sent. Hr. Tr., Page ID 1163. In reaching the $2 per pill estimate, the court explained:

> Drawing from CI input and Wala and Basalyga's communications, the street price range ran from as low as $2 per pill to $3, $4, $6, and even higher. The record plainly shows that the conspiracy wholesale priced as low as $0.50/pill (against a cost of 8.5 to 12.5 cents per pill). But the record shows wholesale marketing at much higher figures, over $1/pill, depending on volume. *See, e.g.*, U.S. Ex. 5 (EZ Bars price quotes). The street price was a significant multiple higher than the wholesale price. This supports that the street price surely never edged below a $2/pill floor. Using $2/pill represents a restrained measure for what defrauded street purchases lost in their misplaced bargain for generic alprazolam pills that actually were counterfeit.

DE 96, Order, Page ID 464–65.

Here, the district court used evidence from the PSR and the government's sentencing exhibits to reach the $2 per pill estimate. Specifically, it relied on Wala's codefendant's text messages regarding "the pricing of a competitor darknet marketplace vendor," which indicated that pills would be resold at "$2/3," that "[i]t's $5-10 a pill in different states," and that dealers would resell approximately one "hundred [pills] for $400." DE 137, PSR (Sealed), Page ID 716. The court also referenced a confidential informant who purchased pills from one of Wala's associates "for approximately three to four years, for $0.60 per pill," and would resell the pills "wholesale for $6.00 per pill," which were "then subsequently resold between $15 and $18 per pill." *Id.* at 699. Finally, the court noted that one of the dark web vendor sites with which Wala was affiliated, EZ Bars,[9] sold counterfeit pills in wholesale quantities from anywhere between $0.43 and $1.16 per pill, depending on the size of order. *See* U.S. Ex. 5, at 00:03–00:37 (showing purchase orders for alprazolam, ranging from $290 for 250 pills to $4,250 for 10,000 pills); U.S. Ex. 6, at 00:02 (quoting $2,500 for 5,000-pill order). Extrapolating from these figures, the court adopted the government's suggested $2 per pill loss figure.

The district court properly relied on Wala and his coconspirator's text messages to estimate total loss. Courts may consider "a co-conspirator's admission as to a scheme's total loss in calculating total loss as it pertains to another co-conspirator." *United States v. Johnson*, 830 F. App'x 153, 160 (6th Cir. 2020); *see also United States v. Germosen*, 139 F.3d 120, 129 (2d Cir. 1998) (finding that estimated loss amount provided by co-conspirators was properly considered by the district court in arriving at its loss calculation); *United States v. Clark*, 986 F.2d 65, 70 (4th Cir. 1993) (holding magistrate did not err by relying on defendant's "own statements" as to value of goods). This is particularly true when that codefendant "had no incentive to inflate" the loss amount. *United States v. Hamilton*, 263 F.3d 645, 654–55 (6th Cir. 2001). Here, Wala and his codefendant's texts were private and sent many years before either was charged with these offenses. Thus, neither had any incentive to inflate the counterfeit pills' estimated street value.

---

[9]Even though Wala argues that he was not affiliated with the distributor EZ Bars, Wala admitted in his objections to the PSR that EZ Bars was a vendor account that he and his coconspirators used to sell their counterfeit pills.

The district court also reasonably inferred that the counterfeit pills' street price would be several multiples higher than the wholesale price. Sentencing courts can draw reasonable inferences from the factual record. *United States v. Richardson*, 843 F. App'x 775, 778 (6th Cir. 2021). Wala marketed to his dark web buyers at prices ranging from $0.43 to $1.16 per pill, depending on quantity. And here, it is undisputed that Wala's buyers resold the pills for profit. Indeed, Wala's codefendant noted that resellers had "[i]nsane" profit margins. DE 137, PSR (Sealed), Page ID 716. And the district court ultimately relied on the most conservative price that Wala's codefendant referenced—selecting a $2 estimate when the record indicated pill prices as high as $10—to estimate total loss. The district court's inferences thus appear reasonable in this context.

Wala admits that his codefendant sent the relevant text messages but suggests that it was speculative for the district court to use those messages to estimate the counterfeit pills' street value. He further argues that the district court clearly erred in calculating total loss because it did not identify specific victims or produce evidence from actual street sales. It is correct that courts may not estimate loss based on "mere speculation." *United States v. Comer*, 93 F.3d 1271, 1285 (6th Cir. 1996). And it is true that the district court did not rely on sales records from actual, confirmed fraudulent transactions to estimate total loss. *See United States v. Nicolescu*, 17 F.4th 706, 720 (6th Cir. 2021) (explaining one factor in finding district court's loss calculation was reasonable was that the loss figure was based on "actual observed transactions" (internal quotation marks omitted)). But the record shows that the district court reasonably estimated the counterfeit pills' street price from statements made by Wala's codefendant and the confidential informant, not "mere speculation." *Comer*, 93 F.3d at 1285. The district court's reliance on these figures therefore provided a "plausible" basis for its estimate. *Estrada-Gonzalez*, 32 F.4th at 614.

Moreover, Wala "has the burden of producing some evidence beyond a bare denial that calls the reliability or correctness of the alleged facts [from the PSR] into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (citation modified). And here, he has not "point[ed] to any specific evidence or alternative calculations showing what" a reasonable street price estimate should be; instead "he simply asserted that the government's figure was wrong."

*United States v. Watkins*, 2024 WL 3218151, at *6 (6th Cir. June 27, 2024).  Without producing some evidence to the contrary, Wala's "bare denial" that his counterfeit pills resold for less than $2 does not create a genuine dispute and therefore does not make the district court's factual finding clearly erroneous.  *See Lang*, 333 F.3d at 681–82.

Nor was it clearly erroneous for the district court to assign the street price to each of the 16.1 million counterfeit pills that Wala distributed.  Wala repeatedly emphasized that his buyers on the dark web were drug dealers who resold the counterfeit pills for profit.  *See, e.g.*, DE 137, PSR (Sealed), Page ID 724–25 (Wala referring to his "wholesale purchasers of the counterfeit pills on [the dark web]" as "drug dealers"); *id.* at 733 (Wala referring to "persons buying the pills" on the dark web "as initial buyer/drug dealers" who were, in his "view, savvy, dark market buyers") (internal quotation marks omitted); *id.* at 743 (Wala referring to his customers as "illegal drug dealers and illegal dark web drug buyers"); *id.* at 744 (Wala referring to his "customers" as "[d]rug dealers who purchased large quantities of counterfeit drugs on an illegal marketplace for resale").  Even more, the record shows that Wala advertised his counterfeit pills specifically to *attract* drug dealer purchasers who would resell the pills to unsuspecting buyers.  *See, e.g.*, U.S. Ex. 6, at 00:20–00:40 (showing listing for counterfeit pills stating that "[e]ach pill is identical to pharma in [s]ize/[t]aste/[c]olor" and that pills "are the best replicas on the market").  Therefore, we are not left with the "definite and firm conviction" that the district erred when it calculated total loss by multiplying the 16.1 million counterfeit pills that Wala trafficked by the conservative $2 per pill street price estimate.  *See United States v. Ellis*, 938 F.3d 757, 761 (6th Cir. 2019) (quotation omitted).

In sum, the district court's $32.2 million estimated loss amount was not "outside the universe of acceptable computations."  *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (citation modified).  Under our deferential standard of review, we therefore hold that the district court's loss calculation was a "reasonable estimate of the loss," and that Wala has not met his burden to show the district clearly erred in calculating his loss amount.  *See United States v. Meda*, 812 F.3d 502, 520 (6th Cir. 2015) (quotation omitted).

**III.**

Wala next argues the district court erred in applying the 10 or more victims or mass-marketing enhancement. Under § 2B1.1(b)(2)(A), this enhancement applies either "[i]f the offense . . . involved 10 or more victims; [or] was committed through mass-marketing." The district court found that Wala triggered both prongs. Because we conclude the district court reasonably inferred that Wala's counterfeit pill scheme caused 10 or more people reasonably foreseeable pecuniary harm, we affirm on the first ground, and do not reach the second ground involving the mass-marketing enhancement.

Under the Guidelines, a victim is "any person who sustained any part of the actual loss determined." U.S.S.G. § 2B1.1 cmt. n.1. "The phrase 'any part' casts a wide net and applies 'so long as a person suffers reasonably foreseeable pecuniary harm as a result of an offense." *United States v. Smith*, 749 F.3d 465, 485 (6th Cir. 2014) (citation omitted). Reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 table note (C)(iv). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money." *Id.* at table note (C)(iii). "Whether a person is a victim under the Sentencing Guidelines is a legal conclusion [that we] review de novo." *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (internal quotation marks omitted).

Wala argues that the district court erred in applying the enhancement because this finding was speculative, and the court failed to "identify ten or more specific individuals who suffered 'any part of the loss.'" CA6 R. 46, Appellant's Br., at 26. He contends that the only victims were the four pharmaceutical companies who manufactured the legitimate alprazolam. For reference, the district court held:

> Although the exact number of victims may not be proven, the 16.1 million pill operation certainly reached more than 10 victims. The EZ Bars documents show hundreds of potential middle-manned deals. The number of persons buying the counterfeit pills on the street is some figure between the numerous wholesale traffickers and 16.1 million. The Court is confident the number trips the SOC.

DE 96, Order, Page ID 465–66.  Because Wala concedes that four pharmaceutical companies were victims, we must find that there were six other victims here to conclude the district court properly applied the enhancement.

We hold that a victim includes any person who bought Wala's counterfeit pills under the wrongful impression that they were purchasing legitimate alprazolam pills.  Wala copied the legitimate pills' imprints with the understanding that there would be negative street market effects if pills were poorly stamped or had uneven efficacy.  *See, e.g.*, U.S. Ex. 2, at 1 (explaining that the "whole entire front face of the bar is missing the press . . . when the press is that off on them, its kind hard to move them to people"); U.S. Ex: 5, at 00:20 (marketing the counterfeit pills as "identical to pharma in [s]ize/[t]aste/[c]olor" and that the "pills [were] the best replicas on the market").  The counterfeit marks signaled to buyers that the pills were FDA-approved and therefore had the safety and quality assurances that come with regulatory approval.  Because the products were counterfeit, they were at least more highly priced than what an end-user would otherwise pay for legitimate generic alprazolam.  *See Milstein*, 401 F.3d at 74 (affirming district court's finding in the Application Note 3(E)(v) context that "contaminated medicine is worthless to the consumer").  And since Wala's deception of end-users was central to his fraud's operation, Wala either "knew, or under the circumstances, reasonably should have known," that these harms were "a potential result of the offense."  U.S.S.G. § 2B1.1 table note (C)(iv).

While the district court did not identify specific victims of Wala's counterfeiting scheme, such identification is not strictly necessary.  *Compare* U.S.S.G. § 2B1.1 cmt. n.1 (no identification requirement), *with* 18 U.S.C. § 3663A(c)(1)(B) (permitting restitution only when there is "an identifiable victim or victims" who "suffered a physical injury or pecuniary loss").  Courts are "free to make reasonable inferences from facts in the record when fashioning a sentence." *United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019).  These inferences must merely "be supported by a preponderance of the evidence." *United States v. Hatcher*, 947 F.3d 383, 395 (6th Cir. 2020).

Given the conspiracy's massive scope and operation, the district court's inference that at least six end users were deceived by Wala's counterfeit pills was reasonable in this context.

Wala admits that he was responsible for distributing 16.1 million counterfeit pills over a five-year span.  The record further shows that Wala sold counterfeit pills to, at a minimum, hundreds of buyers on the dark web during that period.  Wala also admits that he sold the counterfeit pills at wholesale to drug dealer buyers knowing that they would resell the drugs.  *See* DE 137, PSR (Sealed), Page ID 729 (admitting that the PSR correctly characterized his buyers as "drug dealer customers" and "purchasers" who were "after all, resellers"); *id.* at 732 (admitting that his orders ranged from 250 to 10,000 pills).  And the record shows that Wala intended to help his buyers deceive end-users by selling counterfeit pills that were the "best replicas on the market" and "identical" to legitimate pills in "[s]ize/[t]aste/[c]olor."  U.S. Ex. 5, at 00:20.  Thus, the district court relied on a proper factual basis to conclude that Wala knew or, under the circumstances, reasonably should have known, that his offense caused at least six purchasers to suffer reasonably foreseeable pecuniary harm.

Although Wala correctly notes that the government must rely on sufficient evidence for the enhancement to apply, the cases he cites are all distinguishable from the situation presented here.  For example, in *United States v. Yagar*, we found that the district court erred in concluding that certain individuals suffered pecuniary harm where it was not clear whether those people were ultimately reimbursed for their alleged harms.  404 F.3d 967, 971–72 (6th Cir. 2004).  Similarly, in *United States v. Gray*, the Fifth Circuit found that there were insufficient facts in the record to show that the victims suffered any harm where a third-party had "paid for the repairs to the [property] and was thus the only known economic victim."  71 F. App'x 300, 301 (5th Cir. 2003).  And, in *United States v. Lewis*, an unpublished case, we found the district court incorrectly applied the enhancement where the only evidence supporting its finding was the "statement of a single victim" in the PSR.  88 F. App'x 898, 902 (6th Cir. 2004).  In contrast, the record here contains significant evidence allowing the district court to reasonably infer that Wala's offense caused at least six unsuspecting buyers to purchase his counterfeit pills, and that those purchasers were not ultimately reimbursed for their losses.  Thus, we affirm the district court's application of the 10 or more victims enhancement.

**IV.**

Wala also contests the district court's application of a two-level enhancement because the "offense involved . . . the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A). Wala argues at length that we should take sides in a circuit split regarding whether the defendant must have a subjective awareness of the risk or whether the "reckless" modifier introduces a lower knowledge requirement. *Compare United States v. Chin*, 41 F.4th 16, 23 (1st Cir. 2022) (enhancement properly applied where "the risk would have been obvious to a reasonable person in [defendant's] position"); *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2013) (same); *United States v. Lucien*, 347 F.3d 45, 56–57 (2d Cir. 2003) (same); *United States v. Johansson*, 249 F.3d 848, 858–59 (9th Cir. 2001) (same), *with United States v. McCord, Inc.*, 143 F.3d 1095, 1098 (8th Cir. 1998) ("[T]he government must prove not only that the fraudulent conduct created a risk of serious bodily injury, but also that each defendant was in fact aware of and consciously or recklessly disregarded that risk."); *United States v. Mohsin*, 904 F.3d 580, 584–85 (7th Cir. 2018) (same). Our circuit has not yet decided this issue. *See United States v. Silber*, 456 F. App'x 559, 563 (6th Cir. 2012).

We decline, however, to resolve this issue because the district court correctly concluded that Wala's offense involved a risk of death or seriously bodily injury, and that Wala was aware of and consciously or recklessly disregarded these risks. For the § 2B1.1(b)(16)(A) enhancement to apply, the sentencing court need not find "actual injury," but only "that the reckless risk was 'actual, not conjectural.'" *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020) (quoting *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000)). The district court found that Wala's offense "used benzodiazepine-class substances crudely mixed in a storage facility and pressed to appear as properly manufactured generic alprazolam," causing "[m]any millions of pills [to go] from that facility to the street" between 2017 and 2022. DE 96, Order, Page ID 467. It thus recognized that, first, there was significant risk in introducing illicit drugs into an "underground" and "unregulated market." *Id.* Second, it concluded that those drugs "fed a dangerous market" and "ha[d] "high potential for abuse, no currently accepted medical use in treatment in the United States, and [a] lack of accepted safety for use under medical supervision." *Id.* at 468. And third, it found that "[t]he illicit manufacturing also introduced

uncertainty as to 'identity, purity, and quantity,'" and thus "pos[ed] significant adverse health risks to the end user.'" *Id.* (quoting U.S. Ex. 9 (Temporary Placement of Synthetic Benzodiazepines in Schedule 1, 88 Fed. Reg. 48112, 48114–15 (Jul. 26, 2023))).

Wala argues that the district court incorrectly applied the enhancement because it did not show that his counterfeit pills harmed any users. Specifically, he maintains that the record does not show that the counterfeit pills "produced any known casualties or medical emergencies," "overdoses, tainted ingredients, or an unusually potent dosage," or that they "endangered any person's life or health." *See* CA6 R. 57, Reply Br., at 13. But the "the focus here is on actual *risk* of serious bodily injury, not on whether there were actual injuries." *Sosa-Baladron*, 800 F. App'x at 330 (emphasis in original). A sufficient risk plainly exists here.

Moreover, the record contains significant evidence that Wala was aware of and consciously or recklessly disregarded the conspiracy's risk of serious bodily injury or death. Referencing "[a] trove of texts between Wala and [a codefendant]," the district court identified four "demonstrated categories" that showed Wala's awareness of the potential harms:

> First, the actors knew they were part of a massive epidemic of drug (including benzo) abuse across the country . . . . Second, the actors expressly were aiming for a product that would mirror alprazolam, including as to its effects and behavior. . . . Third, the actors plainly recognized the potency of the materials they dealt with and put into the pills . . . . Fourth, the actors recognized the inconsistency in their product combined with the danger in their supply of raw materials.

DE 96, Order, Page ID 471–72. For each category, the district court cited communications between Wala and a codefendant demonstrating their first-hand knowledge of the conspiracy's risks. *See, e.g., id.* at 472 (quoting U.S. Ex. 8, at 1300, 1996) (noting over-strong pills as "hot spots," and acknowledging inconsistent pills, stating that they would "double" orders "from here forward" because "there's no way to tell how many are bad"); *id.* at 471 (quoting U.S. Ex. 8, at 1214–15) ([Codefendant:] "[D]oing this really made me realize how bad the benzo problem is . . . . [Wala:] But it's not as publicized as the opioid epidemic . . . . [Codefendant:] But it's def as bad"); *id.* at 471 (quoting U.S. Ex. 8, at 1957–59) (referencing a worker who wrecked his car after falling asleep in his own driveway, texting "[y]our boy papi was out of it yesterday . . . . High as a kite on the alp . . . . [H]e started the machine w out the cap once powder flying

everywhere . . . . [And the] worse part [is he] . . . [c]rashed his whip parking at his house into wifeys . . . . [F]ell asleep foot on had in the driveway . . . . [Codefendant:] He needs mask on full time").

Wala does not seriously engage with the district court's analysis. He merely argues that it is incorrect to "assume any unregulated pill is automatically 'dangerous'" and that a "fact-driven assessment [is] required by the Guidelines." CA6 R. 57, Reply Br., at 16. But the district court conducted a thorough analysis of the record, referencing thousands of pages of texts between Wala and his codefendant. We therefore hold that the district court did not clearly err in applying the enhancement to Wala's sentence.

## V.

For the foregoing reasons, we affirm Wala's sentence.